Filed 6/14/19

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO

THE PEOPLE,

       Plaintiff and Respondent,

v.

DOUGLAS BRIAN McSHANE,

       Defendant and Appellant.

E069547

(Super.Ct.No. FRE05916)

OPINION

APPEAL from the Superior Court of San Bernardino County.  Ronald M.

Christianson, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and

Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney

General, Julie L. Garland, Senior Assistant Attorney General, and Charles Ragland, Craig

---

*     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts IV and VI.

H. Russell and Tami F. Hennick, Deputy Attorneys General, for Plaintiff and Respondent.

The teenage daughter of defendant Douglas Brian McShane ran away from home. At the daughter's urging, three of her friends tried to steal defendant's truck. Defendant stumbled across the theft in progress, chased the thieves, and after finding them in a nearby field, shot and killed one of them — a 15-year-old boy.

As a result of these tragic events, defendant was convicted of second degree murder (Pen. Code, § 187, subd. (a)), with an enhancement for personally and intentionally discharging a firearm, causing death (Pen. Code, § 12022.53, subd. (d)); he was sentenced to a total of 40 years to life in prison.

Defendant appeals, contending:

1. The trial court erred by failing to instruct on voluntary manslaughter on a heat of passion theory.

2. The trial court erred by refusing to instruct the jury that it could consider voluntary intoxication in determining whether defendant had the intent to kill.

3. Under Penal Code section 1001.36, which became effective while this appeal was pending, defendant is entitled to a remand so the trial court can consider granting him pretrial mental health diversion.

4. Under Senate Bill No. 620 (2017-2018 Reg. Sess.), which also became effective while this appeal was pending, defendant is entitled to a remand so the trial court can consider striking the firearm enhancement.

We agree that defendant is entitled to a remand for consideration of whether to strike the firearm enhancement.  Otherwise, however, his contentions lack merit.

I

FACTUAL BACKGROUND

A.      *February 6:  The Altercation at the Mobile Home*.

Defendant lived with his son Brian, age 17, and his daughter Kristi, age 15.  His children were home-schooled; they had a "tight-knit" group of friends who were also home-schooled.  These included Kristi's best friend, Heather Ryan.  They also included Jerel Cobbs, Damien Saunders, and Devin Humphrey.  Devin's mobile home, near defendant's house, was a "gathering place" for the group.

Around January 27, 2003, defendant's daughter ran away from home; she went to live with a 21-year-old man whom she had met just three days earlier.

On February 6, 2003, defendant showed up at Devin's mobile home.  Six or seven teenagers were there, including Heather, Damien, and Jerel.  Defendant asked if they knew where his daughter was; they said they did not.[1]

Defendant got upset; he called Heather a "liar" and a "whore."  Devin's mother asked defendant to leave, but he refused.  Damien grabbed defendant and tried to push him outside; defendant tried to shake him off.  After a "scuffle," defendant left.

---

[1]      According to Heather, she genuinely did not know where Kristi was.  According to Kristi, however, Heather knew where she was but had promised not to tell defendant.

3

B.    *February 10:  The Shooting of Jerel.*

On the night of February 10-11, 2003, Heather, Jerel, and Damien were once again hanging out at the mobile home.  Kristi told Heather to take defendant's truck and bring it to her, so she could use it to go to Utah with her boyfriend.[2]

Around 11:30 p.m., Heather, Jerel, and Damien left the mobile home, went to an open field across the street from defendant's house, and waited.  When they thought defendant was asleep, they tried to take his truck.

Previously, Heather had seen defendant's son Brian take defendant's truck without permission; Brian used a spoon to pop out the rear window and to start the truck.  Accordingly, the trio popped out the rear window and started to roll the truck out of the driveway.

Defendant woke up and started yelling at them.  They ran west.  When they saw defendant's car, coming from his house, they hid in some bushes.  They then saw defendant going back toward his house.  They jumped a fence and ran to the next street south.  When they got there, they saw defendant's car a third time.  They hid by some buildings until it went past, then ran north again and into the field.  They were heading for the mobile home.

---

[2]    Heather testified that Kristi asked her to take the truck in a phone call that night.  Kristi testified, however, that she had asked Heather, Jerel, and Damien to take the truck the day before, when they were all at her new boyfriend's house.

4

Defendant, however, drove right into the field. Heather dropped to the ground. A few minutes later, she saw Jerel run east, directly across the beams of defendant's headlights.

Defendant fired one blast from the shotgun. Two pellets hit Jerel in the back. One went through his heart and lung. He died within minutes from internal bleeding.

Heather estimated the time from when she ran from defendant's house to when the shot was fired as 45 minutes to an hour.

According to Heather, defendant's son Brian was with him. Brian checked on Jerel, then walked back to defendant; Heather heard them say something about calling the police. Defendant and Brian then went back home, leaving the car in the field.

At 1:46 a.m., defendant called 911. A sheriff's deputy arrived at defendant's home while he was still on the phone with 911. Defendant was "shaky and upset." A shotgun was lying on a nearby dresser.

After the shooting, defendant's blood tested positive for marijuana. Marijuana is detectable in the blood for "a few days" after use.

C. *Defendant's Account*.

1. *Defendant's testimony*.

Defendant had been using marijuana off and on since he was 17. Recently, his regular supplier had disappeared; his new supplier sold "chronic," which was much stronger than regular marijuana. Two or three weeks before the shooting, defendant got

5

into a minor car accident because the chronic "made [him] lost" and he "didn't know which way to turn."

On February 6, 2003, according to defendant, he spoke to Heather on the phone; Heather said she knew where Kristi was, but she was not "at liberty to tell" defendant. He went over to the mobile home because he was not "satisfied with that information."

About an hour after leaving the mobile home, defendant realized he had left his phone and his hat there. He phoned and said he was coming over to get them. A "guy" named Kenneth brought them out to him. Defendant said, "Tell those guys they don't have to worry about me." He said that because he "wanted everything to be peaceful."

On February 10, 2003, defendant went to bed at 10:00 or 10:30 p.m. Right before going to bed, he smoked some marijuana.

Between 1:15 and 1:30 a.m., defendant was awakened by the sound of his cat "meow growling." As he went to let the cat out, he saw two people pushing his truck. When they saw him, they ran away.

At first, he ran after them, even though he was not wearing any shoes. They "veer[ed]" briefly into the yard of a house where some Mexicans lived. This made him think the Mexicans might be the people he was chasing.

When they ran into some bushes, defendant stopped, because he was afraid they might have a weapon. He went back home and put on shoes; he also got his shotgun and loaded it with three shells. The shotgun was to protect himself and to scare the thieves. He used the shotgun for hunting and, every two or three weeks, for target shooting.

6

Defendant did not call 911, because when he had called the police about thefts in the past, they told him if he did not see the thieves, they could not do anything.

He got in his car and circled the block three times, looking for the thieves. He then cut across the field to look behind some buildings on the other side. He saw three people, with their backs to him.

He drove back home and told his son Brian, "They're out in the field, there's three of them, go call the police." He then drove back into the field.

Instead of calling police, however, Brian walked over and into the field. When defendant realized Brian was in the field, where the thieves could attack him, he became "hyper panick[ed]." He stopped his car and jumped out, holding his shotgun.

He saw a person running toward Brian. He "fired the shot in panic." His intention was to protect Brian. However, he did not intend to hurt or kill the other person. He thought he would "knock [the person] down, . . . see who it was, and then . . . let them get up and run away." He "forgot that the gun was dangerous."

Brian checked the body and said, "It's Gene." Gene was an adult who hung out with Kristi and her friends. This was when defendant first thought that the thieves might be some of Kristi's friends.

2. *Defendant's previous statements*.

a. *Defendant's 911 call*.

During the 911 call, defendant was crying; he kept telling the operator to hurry. He said he had just shot one of three teenagers who had tried to steal his truck. As he was going through the field, they "jumped up" and "were coming at" him, so he fired.

He added that, on the previous Thursday, the teenagers had "jumped" him. His daughter had run away; they knew where she was but would not tell him. He got mad at them, and they all got mad at him.

b. *Defendant's statement to the deputy*.

Defendant's statement to the deputy was largely consistent with his testimony at trial, except as follows.

He told the deputy that, when he first got in his car, Brian came with him; after driving around a while, however, he dropped Brian off and told him to call the police.

Defendant loaded his shotgun with only one shell, and only after he drove into the field, although before he got out of his car. As he was walking, three people stood up. He fired because he feared for his safety. He said the reason for the confrontation was that he had gone to a mobile home to look for his runaway daughter, and the people there had threatened to "kick his ass." He insisted that he did not intend to shoot anybody.

By the end of the interview, defendant "was sobbing with his head between his knees[.]"

8

    c. *Defendant's testimony at the first trial.*

Defendant's testimony at his first trial was largely consistent with his testimony at the present trial.

  D. *Expert Testimony*.

Dr. Frank Sheridan, an expert forensic pathologist, testified that marijuana "impairs cognitive functioning" and can "affect quite a wide range of perceptions to varying degrees . . . ."

Dr. Robert Suiter testified for the defense as an expert forensic psychologist. He diagnosed defendant as having a "bipolar-related disorder." At the time of the crime, defendant was "experiencing a heightened degree of anxiety . . . ." His thought processes were "borderline delusion[al] in terms of his fearfulness of the situation and certain persons." His mental disorder would have made him even more likely than the ordinary person to be irrational in an "extremely fearful, stressful, fast-breaking situation." It was possible that defendant could fire a shotgun at someone, just to knock them down, without thinking that they might be hurt or killed.

Dr. Robert Brodie, also an expert forensic psychologist, testified on rebuttal for the prosecution. In his opinion, defendant's behavior at the time of the crime indicated that he was not anxious, but rather frustrated, angry, and determined to find the thieves. Also in his opinion, defendant did not have a mental disorder. He conceded, however, that even people who are not mentally ill can act irrationally in an emergency.

## II

## PROCEDURAL BACKGROUND[3]

In 2003, defendant was charged with second degree murder (Pen. Code, § 187, subd. (a)), along with firearm enhancements (Pen. Code, §§ 12022.5, subd. (a), 12022.53, subds. (b), (c), (d)). In 2004, he was found incompetent to stand trial (Pen. Code, § 1368) and committed to Patton State Hospital.

In 2005, the criminal proceedings were reinstated. After a jury trial, defendant was found guilty as charged and sentenced to a total of 40 years to life in prison. In 2008, we affirmed the judgment. (*People v. McShane* (Jan. 31, 2008, E039494) [nonpub. opn.].)

In 2014, a federal district court denied defendant's petition for writ of habeas corpus. (*McShane v. Cate* (C.D. Cal., July 30, 2014, No. ED CV 09-1243-GW) [nonpub. opn.].) In 2016, the federal appellate court reversed, with directions to grant the petition. It ruled that defense counsel had rendered ineffective assistance of counsel by failing to introduce evidence of defendant's mental health history to support a claim that he acted with the actual but unreasonable intent to defend his son. (*McShane v. Cate* (9th Cir. 2016) [nonpub. opn.].)

---

[3] By means of our tentative opinion (see Ct. App., Fourth Dist., Div. Two, Internal Operating Practices & Proc., VIII, Tentative opinions and oral argument), we gave the parties notice of our intent to take judicial notice of the record in defendant's first appeal. (Evid. Code, § 455, subd. (a).) We now take such judicial notice.

In 2017, in a second jury trial, defendant was once again found guilty as charged and sentenced to a total of 40 years to life in prison.

III

FAILURE TO INSTRUCT ON HEAT OF PASSION

Defendant contends that the trial court erred by failing to instruct on voluntary manslaughter on a heat of passion theory.

The trial court did instruct on voluntary manslaughter on an imperfect self-defense theory.  (CALCRIM No. 571.)  However, it did not instruct on voluntary manslaughter on a heat of passion theory.  (E.g., CALCRIM No. 570.)

"'The trial court must instruct on general legal principles closely related to the case.  This duty extends to necessarily included offenses when the evidence raises a question as to whether all the elements of the charged offense are present . . . .  [¶] Nevertheless, "the existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense . . . ."  [Citation.]  Such instructions are required only where there is "substantial evidence" from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense.'  [Citation.]  'Substantial evidence,' in this context, 'is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.'  [Citation.]"  (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.)

"'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' [Citation.]" (*People v. Nelson* (2016) 1 Cal.5th 513, 538.)

"Voluntary manslaughter is a lesser included offense of murder. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.) "Voluntary manslaughter is 'the unlawful killing of a human being, without malice' 'upon a sudden quarrel or heat of passion.' [Citation.] An unlawful killing is voluntary manslaughter only 'if the killer's reason was actually obscured as the result of a strong passion aroused by a "provocation" sufficient to cause an "'ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment.'" [Citations.]' [Citation.] 'The provocation must be such that an average, sober person would be so inflamed that he or she would lose reason and judgment. Adequate provocation . . . must be affirmatively demonstrated.' [Citation.]" (*People v. Thomas* (2012) 53 Cal.4th 771, 813.) In sum, "'the factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation . . . .' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 549-550.)

"Heat of passion has both objective and subjective components. Objectively, the victim's conduct must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citation.] . . . [¶] Subjectively, 'the accused must be shown to have killed while under "the actual

12

influence of a strong passion" induced by such provocation.  [Citation.]" (*People v. Enraca* (2012) 53 Cal.4th 735, 759.)

"[P]rovocation is not evaluated by whether the average person would *act* in a certain way:  to kill.  Instead, the question is whether the average person would *react* in a certain way:  with his reason and judgment obscured." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.)  However, the provocation must go beyond "mundane annoyances," even if they might make an ordinary person "act[] imprudently or out of anger." (*Id*. at p. 950.)  Heat of passion requires "extreme intensity." (*Ibid*.)  "This passion must be a '"""[v]iolent, intense, high-wrought or enthusiastic emotion"""' [citation].'  [Citation.]" (*Ibid***.**)

Defendant identifies the provocation here as a synergistic combination of the altercation at the mobile home with the attempt to steal his truck  — a combination that he describes as "continuing provocation."

He does not argue that either the altercation at the mobile home, standing alone, or the attempt to steal his truck, standing alone, could constitute adequate provocation.  We deem him to have forfeited these arguments.  We discuss them nevertheless, in the alternative to forfeiture, and as background for our analysis of his continuing provocation argument.

The altercation at the mobile home, standing alone, could not constitute adequate provocation, because four days had passed.  "'""[I]f sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not

13

manslaughter.'"" [Citation.]"  (*People v. Rangel* (2016) 62 Cal.4th 1192, 1225.)  Four days was sufficient "cooling time," as a matter of law.  (*People v. Hach* (2009) 176 Cal.App.4th 1450, 1453-1454, 1458-1459 [6:00 p.m. to midnight].)

The attempt to steal defendant's truck, standing alone, likewise could not constitute adequate provocation.  As far as our research has revealed, there is no case, in California or elsewhere, holding that a taking of property alone can be sufficiently provocative.  To the contrary, *State v. Kelly* (Minn. 1989) 435 N.W.2d 807 specifically held that "the mere fact someone attempted to steal defendant's automobile is not sufficient provocation to support a finding of first degree (heat of passion) manslaughter."  (*Id*. at p. 812; see also *People v. Free* (1976) 37 Ill.App.3d 1050, 1052 ["the fact that the deceased took the defendant's car" was not sufficient provocation for purposes of voluntary manslaughter].)

We turn, then, to the combined effect of the two incidents.  We recognize that provocation "may comprise a single incident or numerous incidents over a period of time. [Citations.]"  (*People v. Le* (2007) 158 Cal.App.4th 516, 528.)  Here, however, there were only two incidents, and they were not similar.  (Cf. *People v. Berry* (1976) 18 Cal.3d 509, 513-516 [for two weeks, defendant's wife taunted him about her infidelity while teasing him sexually].)  Defendant had had ample time to cool off after the first incident, and the second incident was not sufficient provocation in itself.  Thus, this was not a situation in which the whole could add up to more than the sum of the parts.

14

Separately and alternatively, even assuming there was sufficient evidence of provocation to require an instruction on heat of passion voluntary manslaughter, the error was harmless.

In *People v. Breverman* (1998) 19 Cal.4th 142, our Supreme Court held that, in a noncapital case, an erroneous failure to instruct on heat of passion is a violation of state law only, and not a violation of the federal constitution; hence, it is subject to the state-law standard of review. (*Id*. at pp. 164-178; accord, *People v. Beltran*, *supra*, 56 Cal.4th at p. 955.)

Justice Kennard, dissenting in *Breverman*, argued that such a failure *is* a federal constitutional violation, because it renders the instructions on the malice element of murder incomplete. (*People v. Breverman*, *supra*, 19 Cal.4th at pp. 188-194 [dis. opn of Kennard, J.] In a footnote, the majority declined to reach and to decide Justice Kennard's argument, because the defendant had not raised it. (*Id*. at p. 179, fn. 19; see also *People v. Moye*, *supra*, 47 Cal.4th at p. 558, fn. 5.)[4]

Here, defendant urges that the asserted error "should be evaluated under the federal standard because it undermined McShane's due process right to a reliable jury

_____

[4] One of our sister courts has since held — adopting Justice Kennard's argument — that the erroneous refusal to give a heat of passion instruction is a federal constitutional violation. (*People v. Thomas* (2013) 218 Cal.App.4th 630, 643-644.) However, it cautioned that "this case concerns the court's duty to give a requested instruction, not the sua sponte duty to instruct at issue in *Breverman*." (*Id*. at p. 644.) In this case, defendant did not request the instruction that he now claims was required.

15

determination of his legal culpability beyond a reasonable doubt." He does not explain how due process is implicated. Certainly he does not raise Justice Kennard's particular argument. We conclude that, as in *Breverman*, we need only apply the state-law standard of harmless error.

Under that standard, an error must be deemed harmless unless "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

Defendant strenuously denied that the altercation at the mobile home had anything to do with the shooting. After the altercation, he testified, he wanted "peace"; he told Kenneth to tell the others that "they don't have to worry about me." He also testified that he did not recognize the people he was chasing. His working hypothesis was that they were some Mexican neighbors.

Admittedly, he did tell the deputy that "the reason he had a confrontation with these individuals" was that, while he was looking for his runaway daughter, they had threatened to "kick his ass." At trial, however, defendant explained that his son had looked at the victim's body and identified him as "Gene"; then and only then did defendant realize that the thieves might be some of the teenagers who had been at the mobile home.

Significantly, defendant told the 911 operator that the victim was white and 20 years old. Gene was white and about 20; Jerel was black and 15. This corroborated

16

defendant's claim that, at the time, he did not know the thieves were some of the teenagers who had also been present during the altercation at the mobile home.

In sum, defendant's testimony that the altercation at the mobile home had nothing to do with the shooting was consistent and uncontradicted. We therefore see no reasonable probability that the jury would have found that he was acting under a heat of passion induced by the combined effect of the altercation at the mobile home and the theft of his truck.[5]

IV

REFUSAL TO INSTRUCT ON VOLUNTARY INTOXICATION

Defendant contends that the trial court erred by refusing to instruct on voluntary intoxication.

---

[5] If only out of an excess of caution, we note that, even if we were to apply the federal constitutional harmless error standard, we would find that the asserted error was harmless. Under that standard, an error must be deemed prejudicial unless it is shown "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman v. California* (1967) 386 U.S. 18, 24.) Thus, an instructional error is harmless when "the evidence . . . is 'of such compelling force as to show beyond a reasonable doubt' that the erroneous instruction 'must have made no difference in reaching the verdict obtained.' [Citation.]" (*People v. Harris* (1994) 9 Cal.4th 407, 431, fn. omitted.) Here, for the reasons already discussed, the evidence was overwhelming that defendant did not act in a heat of passion induced by some combination of the altercation at the mobile home and the theft of his truck.

A.      *Additional Factual and Procedural Background.*

After both sides rested, the trial court held an off-the-record instructions conference. It then noted for the record that defense counsel had submitted a requested instruction on voluntary intoxication.[6]

It ruled: "The court is not going to give voluntary intoxication because I don't believe the evidence supports the giving of that instruction. [¶] The issue . . . is the marijuana usage on the night of the offense. And although there is evidence that it was used, there is no evidence to support for the jury to make a determination as to how, if at all, that may have played into the thought process of Mr. McShane at the time of the commission of the offense."

Defense counsel then asked to reopen. She made an offer of proof that defendant would testify that his marijuana intoxication was "noticeable, but not severe. . . . [I]t would have been a mild or minor as opposed to moderate or major influence on his thinking." The trial court denied leave to reopen; it adhered to its ruling refusing to give a voluntary intoxication instruction.

---

[6]      The requested instruction is not in the record. Defendant's motion for new trial set forth the alleged text of the instruction but did not support this allegation with a declaration. Thus, we cannot tell whether the requested instruction correctly stated the law. Even if not, however, that was not sufficient reason to deny *any* instruction on the subject. (*People v. Falsetta* (1999) 21 Cal.4th 903, 924; *People v. Fudge* (1994) 7 Cal.4th 1075, 1110.) The trial court could have given a legally correct instruction, such as CALCRIM No. 625.

18

After the verdict, defendant filed a motion for new trial, partly on the ground that defense counsel had rendered ineffective assistance by failing to question him on direct about whether he was feeling the effects of the marijuana.  Defense counsel made another offer of proof, that defendant would have testified that "[h]e did not feel 'stoned' or 'high,'" but the marijuana did make his thinking "'scattered'" and "contribute[d] . . . to his panic and his delusory perceptions . . . ."

The trial court denied the new trial motion, both as untimely and on the merits.

B.      *Discussion*.

"[E]vidence of voluntary intoxication [is] relevant on the issue of whether the defendant actually formed any required specific intent."  (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1242-1243.)  Thus, in a homicide case, it may be relevant to the issue of intent to kill.  (Pen. Code, § 29.4, subd. (b).)

"'[A] defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's "actual formation of specific intent."'  [Citation.]"  (*People v. Verdugo* (2010) 50 Cal.4th 263, 295.)  Substantial evidence of intoxication alone is not enough; there must be substantial evidence that the intoxication impaired the defendant's ability to form the necessary intent.  (*People v. Williams* (1997) 16 Cal.4th 635, 677-678.)

In *People v. Marshall* (1996) 13 Cal.4th 799, there was evidence that the defendant was under the influence of alcohol when he committed the charged murders. He had been drinking "throughout the night, consuming champagne, brandy and malt

liquor," and he had had two or three more drinks in the morning. (*Id*. at p. 847.) The crimes were committed around 10 or 11 a.m. (*Id*. at p. 829.) A test of his blood taken three hours after the crimes showed a blood alcohol level of 0.10 percent. (*Id*. at p. 847.)

The Supreme Court nevertheless held that the trial court did not err by refusing the defendant's request for an instruction on voluntary intoxication: "[E]vidence of the *effect* of defendant's alcohol consumption on his state of mind is lacking. One arresting officer testified that in his opinion defendant was sober when taken into custody. Although another officer testified defendant seemed 'dazed,' this falls short of a reasonable basis for concluding defendant's capacity to entertain the mental state required for murder was diminished. Defendant's blood-alcohol content, tested about three hours after the shootings, suggested some impairment, as might have rendered him an unsafe driver, but the record does not support a conclusion that at the time of the offenses defendant was unable to premeditate or form an intent to kill." (*People v. Marshall*, *supra*, 13 Cal.4th at p. 848; see also *People v. Ivans* (1992) 2 Cal.App.4th 1654, 1662 [evidence that the defendant was using methamphetamine at the time of the crime, without evidence that it affected his mental state, did not require an instruction on voluntary intoxication].)

Here, while there was some evidence that defendant was under the influence of some particularly strong marijuana, there was absolutely no evidence that this had any effect on his ability to form any relevant intent. Defendant himself did not testify that he felt high at the time or that the marijuana affected his perceptions or his intentions. The defense forensic toxicologist did not testify that marijuana can affect specific intent, nor

20

did either forensic psychologist.  The deputy who interviewed defendant just minutes after the shooting  did not report that he appeared intoxicated.  Significantly, defendant "purported to give a detailed account of all of the events of the night in question, and did not suggest that his [intoxication] had affected his memory or conduct."  (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1181.)  Thus, the trial court did not err by refusing to instruct on voluntary intoxication.

Defendant claims the asserted error resulted in a violation of due process.  However, because the evidence was insufficient to raise a reasonable doubt as to whether defendant intended to kill, there was no due process violation.

The trial court also did not err by refusing permission to reopen.  Defendant argues that he was "deprived of his constitutional right to make a meaningful record on appeal . . . ."  Not so, because he was allowed to make an offer of proof.  Moreover, that offer of proof was merely to the effect that the marijuana had a "mild or minor . . . influence on his thinking."  Even if he had been allowed to give this additional testimony, it would not have been substantial evidence that marijuana affected his ability to form the intent to kill.

Defendant does not appear to contend that the trial court erred by denying his motion for new trial.  The trial court denied it, in part, as untimely; certainly defendant does not claim this was error.  In any event, his additional offer of proof in his new trial motion still fell short of raising an inference that he did not have the intent to kill.

## V

## NEW MENTAL HEALTH DIVERSION STATUTE

Defendant contends that he is entitled to a remand so the trial court can consider granting him pretrial mental health diversion under Penal Code section 1001.36.

Penal Code section 1001.36 was enacted on June 27, 2018 (Stats. 2018, ch. 34, § 24, pp. 1318-1321) and took effect immediately. (*Id*., § 37, p. 1341.) In broad general outline, it allows a trial court to grant a defendant pretrial diversion, for the purpose of mental health treatment for up to two years, if it finds that the defendant has a mental disorder that was a significant factor in the commission of the charged offense. (Pen. Code, § 1001.36, subds. (a), (b)(1), (c).) If the defendant performs satisfactorily in diversion, the court must dismiss the criminal charges. (*Id*., subd. (e).)

Penal Code section 1001.36 was amended, however, effective January 1, 2019, to provide that persons charged with certain specified offenses — including murder — are not eligible for diversion. (Pen. Code, § 1001.36, subd. (b)(2), Stats. 2018, ch. 1005, § 1, pp. 6635-6638.)

"'[W]e presume that newly enacted legislation mitigating criminal punishment reflects a determination that the 'former penalty was too severe' and that the ameliorative changes are intended to 'apply to every case to which it constitutionally could apply,' which would include those 'acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.' [Citation.] Th[is] rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or

other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' [Citation.]" (*People v. Buycks* (2018) 5 Cal.5th 857, 881-882.)

In a feat of argumentative gymnastics, defendant argues that:

(1) He is entitled to the benefit of the new diversion provisions, because they are ameliorative; however,

(2) He is not subject to the even newer murder exclusion, because (a) it is not ameliorative, and (b) as applied to him, it would have a prohibited ex post facto effect.

In other words, defendant argues that statutory amendments while a conviction is on appeal are a one-way ratchet — they can reduce punishment, but they cannot restore it. We disagree.

We may assume, without deciding, that the diversion provisions apply in all cases not yet final.[7] Even if so, the murder exclusion can also apply to defendant, without violating either ex post facto or retroactivity principles.

"[W]hether a new law is being applied retrospectively is closely intertwined with the question whether it is an unconstitutional ex post facto law, because a finding that the

---

[7] This issue is presently before the California Supreme Court in *People v. Frahs*, review granted December 27, 2018, S252220.

23

law is being applied retrospectively is a threshold requirement for finding it impermissibly ex post facto." (*In re E.J.* (2010) 47 Cal.4th 1258, 1276.)

"The purpose of the ex post facto doctrine is to ensure fair notice of the conduct that constitutes a crime and of the punishment that may be imposed for a crime. [Citation.]" (*In re Vicks* (2013) 56 Cal.4th 274, 287, fn. omitted.)  Hence, "'the operative event for retroactivity purposes, and the necessary reference point for any ex post facto analysis, is *criminal conduct* committed before the disputed law took effect.'  [Citation.]" (*People v. Trujeque* (2015) 61 Cal.4th 227, 256, italics added.)

Here, when defendant committed the crime, he was not eligible for pretrial diversion, because Penal Code section 1001.36 did not yet exist.  Now, he is not eligible for pretrial diversion, because of the murder exclusion.  Thus, the enactment of the murder exclusion did not change the consequences of his crime *as of the time he committed it*.  The fact (if it is a fact) that he was briefly eligible for pretrial diversion under Penal Code section 1001.36, as originally enacted, is irrelevant to the retroactivity analysis.

*People v. McKinney* (1979) 95 Cal.App.3d 712 is all but on point.  There, the defendant committed kidnapping to commit robbery with bodily harm, first degree murder, and other crimes, in 1975.  (*Id.* at pp. 719, 721, 723, 728.)  At that time, the statutory penalty for kidnapping to commit robbery with bodily harm was either death or life imprisonment without the possibility of parole.  (*Id.* at p. 745.)  He was tried in 1976 (see *id.* at p. 742) and sentenced to life without the possibility of parole.  (*Id.* at p. 745.)

Effective July 1, 1977, the statute was amended so as to reduce the penalty to life imprisonment *with* the possibility of parole. (*People v. McKinney*, *supra*, 95 Cal.App.3d at p. 745.) In 1978, however, an initiative fixed the penalty for kidnapping to commit robbery, when committed in the course of first degree murder, as life without the possibility of parole. (*Ibid*.)

The defendant argued that, under the amendment, he was entitled to have his sentence reduced to life with the possibility of parole. (*People v. McKinney*, *supra*, 95 Cal.App.3d at p. 745.) The appellate court did acknowledge that, "[a]bsent compelling proof of a specific legislative intent that a statute reducing the punishment for an offense is only to apply prospectively, such a statute applies retroactively to all convictions lacking finality at the time of the effective date of the ameliorating law. [Citations.]" (*Ibid*.) It held, however, that "the 1978 statute, operative long prior to the finality of this judgment, restored McKinney's original punishment." (*Id*. at p. 746.)

For similar reasons, here, defendant is not entitled to a remand for consideration of pretrial mental health diversion.

VI

SENATE BILL NO. 620

Defendant contends that he is entitled to a remand for resentencing in light of Senate Bill No. 620 (2017-2018 Reg. Sess.) (SB 620).

As mentioned, the jury found firearm use enhancements to be true. The trial court imposed the enhancement carrying the greatest punishment (Pen. Code, § 12022.53,

25

subd. (d)) and stayed the others, resulting in an additional consecutive term of 25 years to life.

In November 2017, when defendant was sentenced, the trial court had no power to strike a firearm enhancement. (Pen. Code, former § 12022.5, subd. (c), Stats. 2011, ch. 39, § 60, p. 1736; *id*., former § 12022.53, subd. (h), Stats. 2010, ch. 711, § 5, pp. 4036-4043.) However, SB 620 was enacted in October 2017 and became effective in January 2018. (Stats. 2017, ch. 682.) It gives a trial court discretion to strike a firearm enhancement. (Pen. Code, §§ 12022.5, subd. (c), 12022.53, subd. (h).)

Defendant argues that he is entitled to the benefit of this ameliorative change in the law. (See part V, *ante*.) The People concede the point, and we agree. (*People v. Robbins* (2018) 19 Cal.App.5th 660, 678.) Moreover, the People do not argue that it would be an abuse of discretion to strike the firearm enhancements. Accordingly, we will remand with directions to consider whether to strike these enhancements. We express no opinion on how the trial court should exercise its discretion.

VII

DISPOSITION

The judgment with respect to the conviction is affirmed. The judgment with respect to the sentence is reversed, and the matter is remanded with directions to consider whether to strike any of the firearm enhancement enhancements. If the trial court strikes the greatest firearm enhancement, under Penal Code section 12022.53, subdivision (d), it must resentence defendant; otherwise, it must reimpose the same sentence.

26

CERTIFIED FOR PARTIAL PUBLICATION

RAMIREZ
P. J.

We concur:

CODRINGTON
J.

FIELDS
J.