Filed 8/21/20  P. v. Mayberry CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL DANIEL MAYBERRY,<br><br>    Defendant and Appellant. | B296648<br><br>Los Angeles County<br>Super. Ct. No. MA073301 |

APPEAL from a judgment of the Superior Court of Los Angeles County, Daviann L. Mitchell, Judge. Affirmed.

C. Matthew Missakian, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Stephanie C. Santoro, Deputy Attorneys General, for Plaintiff and Respondent.

# INTRODUCTION

Defendant Michael Daniel Mayberry was convicted by a jury of murdering his wife and unlawfully possessing a firearm. The jury found a firearm enhancement allegation true. Defendant appeals, contending trial counsel was ineffective and remand is necessary to allow the court to consider mental health diversion and imposition of a lesser firearm enhancement. We affirm the judgment.

# PROCEDURAL BACKGROUND

Defendant was charged by information with first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and with being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2). Although three firearm enhancement allegations were initially charged, two were dismissed before trial. On February 25, 2019, the jury found defendant guilty of both counts and found the remaining firearm enhancement allegation under section 12022.53, subdivision (d), true.

The court sentenced defendant to a term of 50 years to life for the murder, consisting of 25 years to life for count 1 plus 25 years to life for the firearm enhancement. The court added a two-year concurrent term for count 2, felon in possession of a firearm. The court ordered defendant to pay $9,007.57 in restitution to a victim and another $7,500 to the California Victim Compensation Board. The court also imposed a maximum restitution fine of $10,000.

Defendant filed a timely notice of appeal.

---

[1] All undesignated statutory references are to the Penal Code.

## FACTUAL BACKGROUND

### 1. The People's Case

#### 1.1. The Relationship Between Defendant and His Wife

Defendant married Sandy Mayberry in February 2014. They had three children together. They also raised Sandy's older son from a prior relationship.[2]

After a few years, Sandy had become unhappy with the relationship. Defendant did not work often, and he "had trouble with money." Sandy was the primary wage earner in the family. By November 2017, Sandy wanted to leave the relationship. She stayed in the relationship, however, because defendant threatened to kill himself if she left.

#### 1.2. Sandy Leaves for a Holiday in Mexico

On February 23, 2018, a Friday, Sandy resolved to go away for the weekend to Ensenada, Mexico. She wanted some time by herself to just sit on the beach and rest. That Friday, she seemed "really happy."

Defendant was out of town that weekend. He was due to return on Tuesday. The three older children stayed at home where they were watched by defendant's mother. Devon, the youngest child, stayed with Sandy's sister, Viridiana Valencia.

On Saturday, defendant began calling and texting Valencia. Defendant kept calling to ask if Valencia "knew about Sandy" because Sandy was not taking his calls. Then he began texting, asking questions about photos of two items he found in

---

[2] For clarity, we refer to some individuals by their first names.

3

Sandy's purse. One was a receipt showing Sandy had sent money to Mexico. Another was some writing, which defendant believed was a letter from Sandy to another man. Defendant expressed concern that Sandy might be having a relationship with someone else. He sounded anxious and desperate. Valencia assured him there were innocent explanations for the items and asked him to trust Sandy.

On Sunday, defendant texted Valencia, stating he wanted to come and get Devon. Valencia encouraged defendant to let her and her mother take care of Devon, but defendant insisted on picking him up. Once defendant found out where Devon was, he texted "I'm on my way" and broke off communication.

When defendant arrived, he had an "anxious, desperate" face. He asked Valencia to call Sandy and help him save the marriage. Valencia encouraged him to let Sandy leave the marriage, telling him, "It's better if you guys are friends." Defendant insisted, "No. No. We have too much together. We have a home. We have cars. We have animals. We have the kids."

Valencia relented and called Sandy, who became angry. She did not want to speak to defendant, and she told her sister she would call back later. After this, defendant left with Devon.

When Sandy called back, she told her sister she was coming home. She would gather the children and come stay with Valencia. Sandy was afraid of defendant and wanted to leave him. This was not the first time Sandy told Valencia she was afraid of defendant.

### 1.3. The Murder

That Sunday afternoon, defendant seemed in good humor. As he talked and laughed with their neighbors, Sandy returned

4

home. She and defendant went inside. Defendant's mother was already in the house with the four children.

Inside the house, defendant and Sandy began arguing about Sandy's phone. Defendant wanted the phone, and Sandy did not want to give it to him. Both were yelling. Defendant took the phone, and Sandy went to their neighbor, Terrell Sayles, and asked if she could use his phone to call the police. She did not call the police because defendant returned her phone. Sandy ran back to the house, and defendant followed her.

Defendant's mother, who was inside the house, saw defendant with a gun in his hand. She ran back towards the children, and she heard three shots. She turned, ran outside, and saw Sandy on the ground.

Several minutes after defendant returned the phone to Sandy, Sayles was standing in the doorway of his home when he also heard gunshots. He ran outside and saw "Sandy come diving out of the doorway in front of the house, land[ing] on the walkway in front of her house." She was bleeding.

Defendant came outside holding a gun and walked over and stood over Sandy's head. Sayles begged him to put the gun down. Defendant's mother came out and tried to put herself between defendant and Sandy. Defendant's mother yelled for someone to call 911. Defendant kept saying, "She made me do this."

Defendant walked away from Sandy. Inside the house, the children were crying, and defendant's mother went inside to attend to them. Sayles kept pleading with defendant to put the gun down. Sayles was screaming at him, but defendant did not acknowledge him or even appear to hear him. Defendant just kept saying "she made me do this" or "you made me do this." This went on for three or four minutes.

As Sayles continued to plead with him, defendant returned to Sandy who appeared to be trying to crawl toward the neighbor's house. Sayles thought defendant looked calmer than he had when he had come out of the house.

Defendant pointed the gun at Sandy's head and fired again. Sandy stopped moving. Defendant dropped the gun, took out his cell phone, and called 911. He told the operator he had just shot his wife.[3]

While talking with the 911 operator, defendant tried to pick Sandy up. He held her, saying "Sandy, you made me do this. You made me do this." Defendant calmly told a responding deputy sheriff, "I did it. I did it. I'm sorry."

Sandy was pronounced dead at the scene. She had been shot four times in the back and once in the head. Two of the wounds were immediately life threatening: one to the forehead that went through the brain; and another to the back that went through "the inferior vena cava as well as the right lung."

2. **Defense Case**

    2.1. **Defendant's Testimony**

Defendant testified that he suffered from mental illness most of his life. He had seen mental health professionals since he was eight years old. He was diagnosed with schizophrenia or schizoaffective disorder. Because of his mental health issues, defendant received assistance from SSI. He was prescribed Prozac, Abilify, and another medication he could not remember.

Three months before killing his wife, defendant stopped taking his medications. When he did not take his medications, he

---

[3] The jury heard an audio recording of defendant's 911 call.

6

heard voices. The voices would usually tell him to kill himself. Without the medication, he was also depressed. He thought stopping the medication would improve his relationship with Sandy.

When Sandy returned home that Sunday afternoon, they argued about "her going out there to Mexico and stuff." Defendant had not approved of the trip. When Sandy started using her phone, defendant took it from her, asking why she was texting when he was trying to talk with her. After he returned the phone, they continued arguing. Sandy threatened defendant was "not going to see the kids again." This was the last thing defendant remembered Sandy saying.

Defendant retrieved his handgun, telling Sandy he was going to kill himself. Defendant felt "raged and upset." He was "angry of her words." He believed Sandy would take the kids and not let him see them. After Sandy spoke those words, he "just blacked out." He did not remember how he started firing the gun. "My mind is—just went blank, and I just was shooting." He testified he didn't want to shoot Sandy. He did not remember walking away and coming back to shoot her one last time. He did not hear anyone trying to get him to stop.

Defendant denied killing Sandy because she wanted to leave him. Defendant had never been violent with Sandy. After he shot Sandy the last time, he realized what he had done and he called 911.

### 2.2.  Dr. Stephen Wilson

The defense called Dr. Stephen Wilson, a psychiatrist, who evaluated defendant and reviewed certain medical records. Wilson diagnosed defendant with schizoaffective disorder, which is a combination mood and thought disorder. The thought

disorder results in altered thinking, including auditory hallucinations. The mood disorder is depression. Both symptoms were documented in the medical records that Wilson reviewed. Wilson testified that the schizoaffective disorder could diminish a person's capacity "for good judgment or judgment in general."

## DISCUSSION

### 1.    Counsel was not ineffective.

Defendant contends counsel was ineffective for failing to object: when a witness related a hearsay statement that defendant's wife was afraid of him; during argument when the prosecutor argued facts not in evidence; and during argument when the prosecutor misstated the burden of proof. We disagree.

#### 1.1.    Pertinent Legal Principles

To establish ineffective assistance of counsel, the defendant must demonstrate that: (1) counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel's deficient performance was prejudicial—that is, it is reasonably probable that, but for counsel's deficient performance, the result of the trial would have been more favorable to the defendant. (*In re Crew* (2011) 52 Cal.4th 126, 150; see also *Strickland v. Washington* (1984) 466 U.S. 668, 687.)

"If a claim of ineffective assistance of counsel can be determined on the ground of lack of prejudice, a court need not decide whether counsel's performance was deficient." (*In re Crew*, *supra*, 52 Cal.4th at p. 150.)

### 1.2. The Hearsay Statements

Defendant contends that counsel should have objected to testimony by Valencia that Sandy told her that Sandy wanted to leave her home with her children because she was afraid of defendant. According to Valencia, this was not the first time that Sandy had told her that she was afraid of defendant.

Even if Valencia's account of Sandy's statements was inadmissible hearsay and counsel's performance was deficient, there is no reasonable probability the trial would have turned out more favorably to defendant if the statements had been excluded. (See *In re Crew*, *supra* 52 Cal.4th at p. 150.)

Defendant's conviction for first degree murder was not based on a theory that he harbored a long-standing intent to murder Sandy. The evidence that defendant committed first degree murder was based on the execution-style shooting when defendant returned to shoot the prostrate Sandy in the head. This occurred after the initial shots had been fired in the house, after defendant had followed Sandy out of the house with the gun in his hand, after his mother and Sayles pleaded with him to put the gun down, after defendant repeatedly said that "she made me do this," after defendant had withdrawn into the house, and after Sandy had tried to crawl away. In other words, minutes passed during which others tried to intervene to bring defendant under control, leaving time for reflection and premeditation.

While counsel's decision not to object did not lead to the admission of prejudicial evidence, there were tactical reasons for the defense to let Valencia's testimony about Sandy's statements slip by with as little fanfare as possible. Counsel may well have decided that an objection would unnecessarily elevate the importance of Valencia's testimony. (See *People v. Williams*

9

(1997) 16 Cal.4th 153, 215 [objection would have highlighted unfavorable testimony].) And it was clear enough that Sandy had serious reservations about defendant so it was hardly a surprise that Sandy's reservations extended to fears about him and his behavior.

In short, defendant was not prejudiced by counsel's failure to object to Valencia's testimony about Sandy's fear of defendant.

### 1.3. The Prosecutor's Rebuttal Argument

During rebuttal argument, the prosecutor contended that defendant had made up his testimony about "blacking out" and not remembering the details of the shooting. The prosecutor told the jury this story was "a bit convenien[t] … 'Cause the blackout—the first time it's ever mentioned is ten months after he executes his wife to his psychologist that came and testified as the expert on the defense side." The prosecutor went on to say that "he doesn't mention it to the arresting officers" or "to the detectives that interview him subsequently." The prosecutor also pointed out that defendant had not mentioned blacking out during the 911 call played for the jury. The prosecutor argued defendant's claim of memory loss was also inconsistent with his being calm while talking to the 911 operator, and his telling the neighbors "she made me do it."

At this point in the prosecutor's rebuttal argument, the court called for a sidebar with the lawyers. The court was concerned that defendant's statements to law enforcement had not been introduced into evidence. The court acknowledged that some comments defendant made to arresting officers had been admitted but thought that the prosecutor was risking reversible error in commenting "about him invoking his Fifth Amendment privilege." The court knew defendant had not invoked his Fifth

10

Amendment rights because defendant gave a recorded statement, but the jury did not because the recorded statement had not been presented to the jury. The court asked the prosecutor "to be clear that any reference that you're making is to statements that have been admitted."

The court invited comment from defense counsel. He stated: "I agree. I'm not going to generally object. It's argument. But I think there was a statement given. It was never introduced. And so it took to create that [*sic*] I think would be a problem. Hopefully we can."

The court told the prosecutor to "clarify so there isn't the inference that it has to do with any invoking his rights or something like that."

After the sidebar, the prosecutor continued before the jury: "So I stated earlier, when the arresting officers arrived, the first thing out of his mouth without any questioning, he just blurts out, 'I shot my wife.' There's no mention of a blackout to those arresting officer [*sic*]. He just said, 'I shot my wife. I'm the shooter.'" The prosecutor pointed out that defendant's medical records had not mentioned blackouts. The prosecutor concluded that defendant's story about blacking out "goes to his credibility when he took that stand."

On appeal, defendant contends counsel was ineffective for failing to object and ask the court to admonish the jury to disregard the prosecutor's implication that defendant had provided a statement to the detectives and her specific assertion that he did not mention a blackout to detectives. Further, counsel should have requested the court to admonish the jury to disregard the claim that defendant "had never mentioned a blackout to anyone until 10 months after the shooting, because

11

there was no evidence to support this assertion." Defendant also contends the disclosure that he did not mention a blackout to investigating detectives was "devastating." In defendant's view, this argument "powerfully undercut" his credibility and was therefore prejudicial.

We begin by noting that the defense expressly stated it was not "going to generally object." The defense not only waived the objection, it went on to give a reason for its decision not to object: "It's argument." In any event, we reject the contention that counsel was ineffective in not objecting to the argument.

Two references in the prosecutor's argument are at issue here. One was that there was no evidence that defendant had been interviewed by detectives and that he made no mention of a blackout during that interview. The other was the statement that defendant did not tell anyone of the blackout until 10 months after the murder.

Defendant did not claim he had blacked out when he was being arrested, he did not make such a claim to anyone else who was at the scene, and there was no mention of a blackout during his 911 call. In addition, defendant's behavior during and after the shooting, including his ready admission that he had shot his wife to death, supported the argument that this was not a man who had blacked out during the shooting. Accordingly, the argument that defendant's blackout claim was bogus was supported by the evidence at trial. Given that the overall argument was fair and permissible, the prosecutor's mistaken references to *additional* facts that supported the argument were not material. That is, passing references to detectives and the 10-month lag time could not have made a difference in the outcome of the trial.

There were also sound tactical reasons for defense counsel's decision not to object to the prosecutor's argument. As noted, defendant's 911 call and his statements to the operator had been played to the jury and there was no mention of any blackout. The deputy sheriff who arrived on the scene testified defendant approached him and calmly said: "I did it. I did it. I'm sorry." Again, there was no mention of a blackout, but there was a confession of the shooting. An objection to the references to detectives and the passage in time would have come across as a quarrel over minor details when the larger picture supported the prosecutor's argument. And objecting to those details (detectives, time lag) and leaving everything else undisturbed would only have emphasized the probative value of the evidence.

We conclude that the decision not to object to the prosecutor's argument did not fall below an objective standard of reasonableness under prevailing professional norms. (*In re Crew*, *supra*, 52 Cal.4th at p. 150.)

### 1.4.    The Prosecutor's Argument Regarding Reasonable Doubt

The prosecutor attempted to explain the reasonable doubt standard during closing argument: "Let's talk about the standard in which you're going to judge everything in this case, the evidence. It's just beyond a reasonable doubt. The jury instructions defined it to you, and I don't want to get into too much that's outside of what the jury instructions tell you; so what it tells us it is. It's an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt. Okay. So sometimes easier to talk about reasonable doubt and what it isn't; so I'll give you a few examples."

"What it's not is not proof beyond any doubt or all doubt. It's not proof beyond a shadow of a doubt, and it's not 100 percent certainty. What a good definition that's kind of grown out of a lot of cases over the years is it's the only reasonable explanation, the only reasonable explanation, that fits all the facts. Okay."

The prosecutor's purported explanation of reasonable doubt as the "only reasonable explanation" that "fits all the facts" is confusing and unhelpful. The challenged comment, however, was limited to a single sentence and followed on the heels of a correct statement of the standard of proof. And regarding a "reasonable conclusion" (not explanation), the jury was properly instructed that it had to be "convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant had the required intent and mental state." When considering circumstantial evidence, the jury was also instructed it had to "accept only reasonable conclusions and reject any that are unreasonable."

In short, when viewed in context, it is not reasonably likely that the prosecutor's comment would have been interpreted by the jury as lowering the People's burden. Accordingly, counsel's decision not to object did not fall below an objective standard of reasonableness under prevailing professional norms. (*In re Crew*, *supra*, 52 Cal.4th at p 150.)

### 1.5. Cumulative Error

Defendant also contends that the cumulative effect of the errors during his trial mandates reversal. Because we have found no error, there is no cumulative error to evaluate. (See *People v. Lopez* (2018) 5 Cal.5th 339, 371.)

## 2.     Mental Health Diversion

Next, defendant contends this court must conditionally remand the matter to permit the trial court to consider whether to grant him mental health diversion under section 1001.36. We disagree.

Section 1001.36 went into effect on June 27, 2018. (Stats. 2018, ch. 34, § 24, eff. June 27, 2018 (A.B. 1810).) The new law provided trial courts with the discretion to grant "pretrial diversion, for the purpose of mental health treatment for up to two years, if it finds the defendant has a mental disorder that was a significant factor in the commission of the charged offense." (*People v. McShane* (2019) 36 Cal.App.5th 245, 259, review granted Sept. 18, 2019, S257018 (*McShane*).) The statute requires the court to dismiss the criminal charges if the defendant performs satisfactorily in diversion. (§ 1001.36, subd. (e).) Effective January 1, 2019, the Legislature amended the statute to preclude diversion for defendants charged with certain serious offenses including murder. (Stats. 2018, ch. 1005, § 1, eff. Jan. 1, 2019 (S.B. 215).)

Recently, the California Supreme Court held that section 1001.36 applies retroactively to cases in which the judgment is not yet final. (*People v. Frahs* (2020) 9 Cal.5th 618, 624.) Whether section 1001.36 is retroactive as originally enacted, but not as amended, is under review by the Supreme Court. (*McShane*, *supra*, 36 Cal.App.5th at pp. 260–261, review granted; *People v. Cawkwell* (2019) 34 Cal.App.5th 1048, 1053, review granted Aug. 14, 2019, S256113.)

In *McShane*, the court addressed the same contention defendant raises here. (*McShane*, *supra*, 36 Cal.App.5th 245, review granted.) McShane argued he was entitled to the

retroactive benefit of the 2018 diversion law, but that the 2019 amendment excluding those charged with murder did not apply to him. (*Id.* at pp. 259–260.) The court disagreed, holding that if section 1001.36 was retroactive, it was retroactive as amended. (*Id.* at pp. 260–261.) The fact that the defendant was briefly eligible for pretrial diversion under the statute, as originally enacted, was irrelevant to the retroactivity analysis. (*Id.* at p. 260.)

We agree with *McShane*. There is no impediment in applying the amended version of section 1001.36 retroactively to defendant. Nor is there any unfairness or injustice in doing so. Because defendant was convicted of murder he is ineligible for mental health diversion under the statute.

### 3.    Imposition of a Lesser Included Firearm Enhancement

Defendant also contends remand is necessary because "[t]he record contains no indication that the trial court here was aware of and considered its power to impose an 'uncharged' lesser included gun enhancement instead of the greater enhancement." Although appellate courts are currently split on whether a sentencing court may impose a lesser included uncharged enhancement under section 12022.53, there is no need for us to wade into this controversy. (Compare *People v. Morrison* (2019) 34 Cal.App.5th 217 [courts may impose unpled lesser enhancements] with *People v. Tirado* (2019) 38 Cal.App.5th 637, review granted Nov. 13, 2019, S257658 [courts may not]; *People v. Garcia* (2020) 46 Cal.App.5th 786, review granted June 10, 2020, S261772 [same]; *People v. Yanez* (2020) 44 Cal.App.5th 452, review granted Apr. 22, 2020, S260819 [same].) In this case, the court made it unequivocally clear that it would not strike the firearm enhancement found true by the jury. Accordingly,

16

remand to allow the court to impose a lesser included uncharged enhancement would be a futile act.

Section 12022.53 lists three enhancements of increasing severity. (§ 12022.53, subds. (b), (c), (d).) For personal use of a firearm in the commission of certain felony offenses, the law provides an additional sentence of 10 years. (*Id.*, subd. (b).) For personal and intentional discharge of a firearm, the law provides an additional 20-year term. (*Id.*, subd. (c).) A 25-years-to-life enhancement is provided for the personal and intentional discharge of a firearm causing great bodily injury or death. (*Id.*, subd. (d).) An amendment that became effective on January 1, 2018 provides that courts may pursuant to section 1385 "strike or dismiss an enhancement otherwise required to be imposed by this section." (§ 12022.53, subd. (h).)

In defendant's case, the People charged and the jury found true the allegation that defendant "personally and intentionally discharged a firearm, a handgun, which caused great bodily injury and death" under section 12022.53, subdivision (d). At sentencing, the court observed that defendant had not asked the court to strike the firearm enhancement. The court explained it would not exercise that discretion in any event, and, importantly: "[I]n no way, shape, or form would I exercise it in this case based on the egregious nature of this case and the fact that this, in my opinion, was planned out on your part by purchasing that gun in advance or having that gun available to you." Given the court's emphatic statements, it would be pointless to remand the case to allow the court to exercise its discretion to strike the greater enhancement and—assuming it has that authority— impose an uncharged lesser enhancement.

17

### 4.     The Restitution Fine

Finally, defendant contends trial counsel was ineffective for failing to request a hearing to determine defendant's ability to pay the $10,000 restitution fine. "If the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068–1069.)

Here, the record is insufficiently developed to address the issue on direct appeal. In any event, considering the gravity of defendant's offense, counsel could have reasonably assumed the court would deny any request to reduce the restitution fine. In sum, on this record, we cannot find counsel was ineffective for failing to request a hearing to determine defendant's ability to pay the $10,000 restitution fine.

## DISPOSITION

The judgment is affirmed.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


                                                         LAVIN, J.

WE CONCUR:


EDMON, P. J.


EGERTON, J.