Filed 4/29/21  P. v. Cruz CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B304290 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA144805) |
| v. | |
| JUAN CARLOS CRUZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed as modified.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Juan Carlos Cruz appeals from his judgment of conviction of second degree murder (Pen. Code,[1] § 187, subd. (a)) and shooting at an occupied vehicle (§ 246) with true findings on firearm enhancement allegations (§ 12022.53, subds. (b)-(d)). On appeal, Cruz contends the trial court erred in failing to instruct the jury on voluntary manslaughter under a heat of passion theory. Cruz also claims the trial court abused its discretion in imposing a firearm enhancement on the murder count under section 12022.53, subdivision (d) rather than a lesser-included enhancement under subdivision (b) or (c). We modify the judgment to accurately reflect Cruz's actual custody credits, but otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Cruz's Prior Relationship with the Victim

The victim in this case was Arturo Villanueva San Vicente. Cruz and Villanueva became friends after working together at a car wash. While hanging out with Cruz, Villanueva met Cruz's wife, Jennifer Perez, and they also became friends. At some point, Villanueva began suggesting to Perez that Cruz was cheating on her. Perez initially did not believe him. However, in April 2017, Perez became upset at Cruz because he was flirting with a friend that Perez had invited to their home. When Cruz left with Perez's friend and did not return home until later that night, Perez believed he was having an affair.

On April 8, 2017, Perez began a four-month affair with Villanueva as revenge against Cruz. On the day the affair

_____

[1] All further statutory references are to the Penal Code.

started, Villanueva posted on his Instagram account a picture of a hand holding a gun with the statement "[a] short one for the ones I'm against."  The post included the hashtag "Juanito," which was Cruz's nickname.  When Villanueva showed the post to Perez, he said he wanted to prove he was not afraid of Cruz and to see if Cruz would confront him.  Villanueva's Facebook profile also had a picture of him with a rifle.

According to Perez, Villanueva became obsessed with her over the course of their affair.  He repeatedly asked her to leave Cruz and run away with him to Mexico.  He began checking Cruz's location on social media platforms, and he once showed up at Perez's home when he thought Cruz was not there.  Although Perez told him to leave, Villanueva refused and said he would "start doing drama" if she did not come outside.  He also said he was not afraid of Cruz and would not mind facing him if Cruz came home.  On another occasion, Villanueva told Perez, "[I]f you don't leave with me in a good way, you're going to leave with me in a bad way."  He then slashed Perez's bedroom window screen.

Starting in July 2017, Villanueva began making threats to Perez about killing Cruz.  He told Perez he would "get rid of" Cruz because "that's what it was going to take" for her to leave him.  He also said he would get a gun from his friend, Jonathan Castro, who was in a gang and was willing to help him kill Cruz.  Villanueva told Perez "all it takes is one," which she understood to mean "one gunshot to remove" Cruz.  By early August, Perez was fearful because Villanueva was talking more about killing Cruz and leaving with Perez to Mexico.  Villanueva made clear to Perez that he was willing to get rid of Cruz so that they could be together, and he was angry when Perez refused to leave her husband for him.

3

Perez told her friend, Estefany Merino, about her affair with Villanueva. On a few occasions, Perez also asked Merino to accompany her on dates with Villanueva so that Merino could act as a cover for Perez in case anyone she knew saw them together. Although Perez told Merino that Villanueva had twice threatened to "kill or get rid" of Cruz, Merino did not consider the threats to be "too serious." On one occasion, Villanueva called Merino and told her he wanted Perez to run away with him, and he wanted to get a gun from his friend so that he could get rid of Cruz. In response, Merino warned Villanueva "not to do anything crazy," and to leave Perez alone because she would "never leave her family." The last time Merino went out with Perez and Villanueva, she heard Villanueva tell Perez that she needed to leave Cruz and that he would kill him. At that point, Merino advised Perez that she should stop seeing Villanueva.

On August 4, 2017, Perez ended the affair with Villanueva because of his escalating threats and other behavior. On October 5, Villanueva changed his Facebook profile to a picture of him holding a rifle with the statement: "I went out with God. If I don't come back, it's because I left with him." The profile picture also showed a girl next to a truck stating "fuck your Ford." Perez believed Villanueva intended the picture to "trigger" Cruz, who drove a Ford Explorer at the time.

On November 13, 2017, Perez disclosed the affair to Cruz. According to Perez, she confessed to Cruz because Villanueva's threats had "started getting more intense." Cruz initially was calm, but became angry at both Perez and Villanueva as Perez disclosed the details of the affair. When Cruz asked Perez why she decided to tell him at that time, Perez said that Villanueva was making threats against him. In describing the threats to

Cruz, Perez said Villanueva and Castro were setting Cruz up to kill him, and Villanueva claimed he could get a gun from Castro to use against Cruz. She also told Cruz that Villanueva repeatedly said he was going to kill Cruz and had slashed their bedroom window screen. After Perez told Cruz about the affair, he was so angry that he did not want to see or talk to her. Cruz was also worried about the threats and feared for his life and the lives of their young children, who might be with Cruz if he were attacked. Perez believed Cruz stayed upset over the next several days and did not calm down.

II.    **Cruz Fatally Shoots Villanueva in His Vehicle**

On the night of November 18, 2017, five days after Perez disclosed the affair, Cruz fatally shot Villanueva while Villanueva was sitting inside his vehicle. Earlier that evening, Villanueva had been with his good friend, Castro, a self-admitted gang member.[2] As Villanueva was driving Castro home, he mentioned he had dropped a container of medical marijuana inside his vehicle. When they arrived at the apartment complex where Castro resided, they recognized Cruz's truck parked in the driveway. Villanueva parked his vehicle along the street. Villanueva told Castro he was going to look for the container of marijuana he had dropped while driving. As Castro was leaving the vehicle, Villanueva remained in the driver's seat. He was turned toward his right, looking in the center console area.

---

[2] According to Castro, Villanueva had asked Castro to get him a gun because he was afraid of Cruz. Castro did not own or possess a gun and did not obtain one for Villanueva.

Castro stopped on the sidewalk to talk to a neighbor. While the men were having a conversation, Cruz walked past them between two parked trucks. Cruz did not say anything to the men, and instead continued walking toward the driver's side of Villanueva's vehicle. Castro saw Cruz open the driver's door and quickly fire multiple shots at Villanueva with a gun. Cruz then closed the door, walked toward the back of the vehicle, and made eye contact with Castro. Cruz's face showed panic, shock, and horror, but he did not speak.

Fearing for his life, Castro ran inside his apartment. He told his girlfriend, Guadalupe Flores, that something had happened to Villanueva and asked her to check on him. As Flores walked outside, she saw Cruz get in his truck and drive away. Flores approached Villanueva's vehicle and opened the passenger door. Villanueva was slouched over the center console between the driver's and passenger seats. His knees were on the driver's seat and his body was turned toward the back of the vehicle. After calling 911, Flores opened the driver's door so that she could render aid to Villanueva. At that time, Castro came back outside and helped Flores pull Villanueva out of the vehicle and onto the ground. Responding paramedics were unable to revive Villanueva at the scene.

Villanueva died from multiple gunshot wounds. He sustained six gunshot wounds, four of which were fatal. The pathway of each of the bullets was back to front, right to left, and downward in the victim. The four fatal wounds were caused by bullets entering the back or right side of the body and exiting the front or left side. The two nonfatal wounds were due to bullets entering and exiting the back and right arm.

Surveillance video from an apartment building across the street did not capture the actual shooting. However, it showed that, prior to the shooting, Villanueva's vehicle slowed down as it passed in front of Cruz's parked truck. A short time later, two figures walked in succession from Cruz's truck in the direction where Villanueva had parked his vehicle. After some time, one figure ran back to Cruz's truck followed by a second figure who walked back to the truck. A third figure, who appeared to be Castro, then walked toward the gate of the apartment complex. No weapon was found inside Villanueva's vehicle.

III.  **Cruz's Statement to the Police**

On November 30, 2017, Cruz was arrested. In a recorded interview with the police, Cruz initially denied he was present at the shooting. When told he was captured on video at the scene of the shooting, Cruz admitted that he and a friend named Lalo were standing nearby and heard gunshots, but denied he was involved. Later in the interview, Cruz admitted that he shot Villanueva. Cruz said he was high on drugs and felt his life was in danger because he had been told Villanueva wanted to kill him. Cruz also said he felt threatened by Villanueva and "[j]ust snapped." As described by Cruz, he went to the apartment complex to visit a friend and "[p]anicked" when he saw Villanueva pull up in his vehicle. Because Villanueva stayed inside the vehicle, Cruz began to think Villanueva was going to shoot him so he "had to do what [he] had to do, before [he was] killed." Cruz did not say anything to Villanueva. He "[j]ust walked up and shot him." Cruz then panicked and left in his truck. He later got rid of the gun by tossing it into a lagoon.

7

## IV.  Cruz's Trial Testimony

Cruz testified on his own behalf at trial.  According to his testimony, Cruz was 28 years old at the time of trial, was married to Perez, and had three young children with her.  He did not have any prior misdemeanor or felony convictions.  As of 2017, Cruz had known Villanueva for about five years and considered him to be a good friend.  In April 2017, however, Villanueva suddenly stopped talking to him.  In July, Cruz saw Villanueva's Instagram post showing the picture of a gun with the hashtag "Juanito."  Although Cruz wondered about the meaning of the post, he did not perceive it as a threat at that time.  In July, Cruz left his job at the car wash and began working in a bakery.  After changing jobs, Cruz did not have any contact with Villanueva until the shooting.

In November 2017, about five days before the shooting, Perez told Cruz she had an affair with Villanueva, and Villanueva was making threats against his life.  Cruz initially was shocked, but when Perez disclosed details of the affair, he understood why Villanueva had stopped talking to him.  Cruz also understood the meaning of Villanueva's social media post when Perez disclosed that Villanueva wanted to kill Cruz and wanted Perez to run away with him.  While Perez did not tell Cruz if Villanueva had a gun, Cruz knew Villanueva had access to guns through Castro.  Perez's admissions made Cruz feel hurt, angry, and worried.  The affair was humiliating to Cruz.  He had friends in common with Villanueva and was embarrassed that they would know his wife had a sexual relationship with his friend.  Cruz was also worried because he believed Villanueva was serious about wanting to kill him.  After Perez told him

8

about the threats, Cruz began carrying a loaded revolver in his pocket for protection from Villanueva.

On the night of the shooting, Cruz and Lalo went to the apartment complex to visit a friend named Alfredo. Cruz had consumed alcohol, cocaine, and methamphetamine throughout the day. As Cruz was standing on the sidewalk talking to the men, he noticed Villanueva's vehicle parked on the street. Castro got out of the vehicle and approached the group. He spoke to Alfredo but ignored Cruz. Cruz wondered why Villanueva had stayed inside the vehicle, and started to get worried and nervous. Cruz decided to talk to Villanueva rather than leave. He believed that, even if he left at that time, "the problem [was] still going to be there," and he did not "want to be living [his] life looking over [his] shoulder." As he was walking toward the vehicle, Cruz did not intend to shoot Villanueva, but only to speak with him.

Cruz could not see inside Villanueva's vehicle because the windows were darkly tinted. The driver's door of the vehicle was slightly ajar. When Cruz pulled the handle and opened the door, he saw Villanueva sitting in the driver's seat. Villanueva gave Cruz an angry look and then quickly reached to his right and grabbed a gun from the center console area. In response, Cruz pulled his own gun from his pocket, pointed it at Villanueva, and "shot him as fast as [he] could." Cruz did not wait for Villanueva to point the gun at him because he did not want to get shot. While firing his weapon, Cruz felt panic and fear for his life. At that moment, Cruz believed he was going to die based on the look on Villanueva's face, his social media post, the fact that Villanueva had suddenly stopped talking to Cruz, and Perez's statements that Villanueva wanted to kill him. Cruz would not have shot Villanueva if he did not think he saw a gun.

9

Immediately after the shooting, Cruz was scared and in shock.  He stood by the vehicle for a few seconds, then walked back to his truck.  He decided to leave the scene because he thought the police would not believe him.  Cruz got rid of the gun after the shooting because he was afraid and did not want the weapon in his possession.  Although Cruz was under the influence of drugs and alcohol at the time of the shooting, he denied that it caused him to fire his gun at Villanueva.  Cruz testified that the "[o]nly thing that caused [him] to shoot [Villanueva] was fear, that [Villanueva] was about to shoot [him]."

V.    **Jury Verdict and Sentencing**

The jury found Cruz guilty of second degree murder (§ 187, subd. (a)) and shooting at an occupied motor vehicle (§ 246).  On each count, the jury found the firearm enhancement allegations under section 12022.53, subdivisions (b), (c), and (d) to be true.  The trial court sentenced Cruz to a total term of 40 years to life in state prison, consisting of 15 years to life on the second degree murder count, plus 25 years to life on the firearm enhancement under section 12022.53, subdivision (d).  The court stayed the sentence on the remaining firearm enhancements on the murder count pursuant to section 12022.53, subdivision (f).  The court also stayed the sentence on the shooting at an occupied vehicle count pursuant to section 654, and struck each firearm enhancement on that count pursuant to section 1385.

Cruz timely appealed.

# DISCUSSION

## I. Failure to Instruct on Voluntary Manslaughter Based on Heat of Passion

On appeal, Cruz asserts the trial court erred in failing to instruct the jury sua sponte on voluntary manslaughter under a heat of passion theory. Although the trial court instructed the jury on voluntary manslaughter based on imperfect self-defense, Cruz argues a voluntary manslaughter instruction based on heat of passion was also warranted because there was substantial evidence to support a finding that he killed Villanueva in a heat of passion due to sufficient and continuing provocation.

### A. *Governing Legal Principles*

It is the trial court's " ' " 'duty to instruct the jury not only on the crime with which the defendant is charged, but also on any lesser offense that is both included in the offense charged and shown by the evidence to have been committed.' " ' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 718, italics omitted.) " ' "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.' " ' " (*People v. Souza* (2012) 54 Cal.4th 90, 116.) In this context, the " 'substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak,' " but rather by evidence from which a jury . . . could conclude "that the lesser offense, but not the greater, was committed." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) " 'On appeal, we review independently the question whether the trial court improperly failed to instruct on a lesser included offense.' " (*Ibid.*)

" 'Murder is the unlawful killing of a human being . . . with malice aforethought.' (§ 187, subd. (a).) 'Manslaughter is the

11

unlawful killing of a human being without malice.' (§ 192, subd. (a).) Manslaughter is a lesser included offense of murder, and a defendant who commits an intentional and unlawful killing but who lacks malice is guilty of voluntary manslaughter." (*People v. Nelson*, *supra*, 1 Cal.5th at p. 538.) For "purposes of voluntary manslaughter—an unlawful killing without malice— the absence of malice is limited to two circumstances: ' " 'when the defendant acts in a "sudden quarrel or heat of passion" (§ 192, subd. (a)), or when the defendant kills in "unreasonable self- defense"—the unreasonable but good faith belief in having to act in self-defense.' " ' " (*People v. Landry* (2016) 2 Cal.5th 52, 92.) "If either of these circumstances is found, an unlawful killing will be voluntary manslaughter rather than murder." (*Id.* at p. 97.)

"Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' " (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) A heat of passion theory of voluntary manslaughter has both an objective and a subjective component. (*People v. Moye* (2009) 47 Cal.4th 537, 549.) Objectively, " ' "the accused's heat of passion must be due to 'sufficient provocation' " ' " (*ibid.*), and subjectively, "the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation" (*id.* at p. 550). The " ' "factor which distinguishes the 'heat of passion' form of voluntary manslaughter from murder is provocation." ' [Citation.] 'To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . . [T]he anger or other

passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 649.)

B. ***The Trial Court Did Not Prejudicially Err in Failing to Instruct the Jury on the Heat of Passion Theory of Voluntary Manslaughter***

For purposes of the murder charge in this case, the trial court instructed the jury on first and second degree murder with malice aforethought, involuntary manslaughter, and the effect of voluntary intoxication on homicide crimes. The trial court also instructed the jury on both justifiable homicide based on self-defense and voluntary manslaughter based on imperfect self-defense. Cruz did not request, and the trial court did not give, an instruction on voluntary manslaughter based on heat of passion. On appeal, Cruz contends there was substantial evidence from which the jury could have found that he killed Villanueva in the heat of passion, and thus, the failure to instruct the jury sua sponte on this theory of voluntary manslaughter constitutes reversible error. We conclude this claim lacks merit.

Cruz argues a heat of passion instruction was required because there was evidence that Villanueva made provocative and continuing threats to kill Cruz and take his family to Mexico, and that upon learning of the threats from his wife, Cruz reacted by confronting and shooting Villanueva in a heat of passion. It is true, as Cruz asserts, that the "provocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over a period of time." (*People v. Wharton* (1991) 53 Cal.3d 522, 569; accord, *People v. McShane* (2019) 36 Cal.App.5th 245, 256 ["provocation 'may comprise a single incident or numerous

13

incidents over a period of time'"].) However, if " 'sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter.' " (*People v. Beltran*, *supra*, 56 Cal.4th at p. 951.) To warrant a voluntary manslaughter instruction, "the killing must be 'upon a sudden quarrel or heat of passion' [citation]; that is, 'suddenly as a response to the provocation, and not belatedly as revenge or punishment.' " (*People v. Daniels* (1991) 52 Cal.3d 815, 868.) "Accordingly, it is not sufficient that a person 'is provoked and [then] *later* kills.' " (*People v. Nelson*, *supra*, 1 Cal.5th at p. 539.)

Here, Cruz's wife, Perez, testified that Villanueva made repeated and escalating threats to kill Cruz between July and August 2017. Although Perez did not have any contact with Villanueva after she ended their affair in early August, she perceived Villanueva's October 5 Facebook post in which he posed with a rifle and made a derogatory remark about the type of vehicle that Cruz drove as an additional attempt to "trigger" Cruz. On November 13, Perez disclosed to Cruz the affair and Villanueva's threats. While Cruz felt hurt, angry, and worried upon learning of the affair and Villanueva's threats against his life, he did not take any immediate action in response to Perez's disclosures. It was not until five days later, on November 18, that Cruz decided to approach Villanueva when he saw Villanueva's vehicle parked on the street. Because this five-day period was sufficient time for Cruz's "passion to subside and reason to return," the evidence of Villanueva's prior threats of violence did not, standing alone, constitute legally sufficient provocation to warrant a voluntary manslaughter instruction. (*People v. Beltran*, *supra*, 56 Cal.4th at p. 951; see *People v. Moye*,

14

*supra*, 47 Cal.4th at p. 551 [voluntary manslaughter instruction not required where evidence of fight involving defendant and victim the evening before victim's deadly beating "did not itself constitute legally sufficient provocation"]; *People v. Pride* (1992) 3 Cal.4th 195, 250 [three-day gap between act of provocation and fatal stabbing of victim rendered provocation "insufficient as a matter of law to arouse feelings of homicidal rage or passion in an ordinarily reasonable person"]; *People v. McShane*, *supra*, 36 Cal.App.5th at p. 256 [defendant's altercation with victim four days before fatal shooting was not adequate provocation because "[f]our days was sufficient 'cooling time,' as a matter of law"].)

Cruz further asserts that, on the night of the shooting, he was provoked into killing Villanueva because he believed that Villanueva was prepared to kill him and that Villanueva might be armed with a gun. Cruz notes that Perez testified she told him about Villanueva's plan to get a gun from his gang member friend, Castro, and to use it to "set [Cruz] up and kill [him]." Cruz also notes that, while no gun was found in Villanueva's vehicle, Castro could have removed the weapon prior to the arrival of the police to avoid scrutiny into his own involvement in the shooting.

Yet, even assuming that Cruz reasonably believed Villanueva was armed with a gun when he approached the vehicle, Cruz was not entitled to an instruction on voluntary manslaughter under a heat of passion theory. Based on Cruz's own trial testimony, immediately before the shooting he approached Villanueva's vehicle feeling worried or nervous, but with the rational intent of merely talking to Villanueva. The only passion or intense emotion that Cruz experienced occurred as he shot Villanueva because he feared for his own life and thought

15

Villanueva was going to shoot him. The jury was instructed both on justifiable homicide based on reasonable self-defense and voluntary manslaughter based on imperfect self-defense. Under these circumstances, the trial court was not required to also instruct the jury on voluntary manslaughter based on heat of passion.

The California Supreme Court's decision in *People v. Moye*, *supra*, 47 Cal.4th 537, is instructive on this issue. The defendant in *Moye* was convicted of second degree murder. (*Id*. at p. 540.) The evidence showed he killed the victim during a confrontation that took place the morning after they had engaged in a fistfight. (*Id*. at pp. 542–554.) According to the defendant's uncontested testimony, on the morning of the killing, the victim attacked him with a baseball bat after he approached the victim on the street and then chased him over a fence. (*Id*. at p. 552.) The defendant fended off the attack by grabbing the bat from the victim and striking him with it in self-defense until the victim fell to the ground. (*Ibid*.) While the trial court instructed the jury both on justifiable homicide based on reasonable self-defense and voluntary manslaughter based on imperfect self-defense, it refused a defense request for an instruction on voluntary manslaughter based on heat of passion. (*Id*. at p. 550.) On appeal, the Supreme Court concluded the trial court did not err in refusing to give a heat of passion instruction, stating: The "thrust of defendant's testimony below was self-defense—both reasonable self-defense (a complete defense to the criminal charges), and unreasonable or imperfect self-defense (a partial defense that reduces murder to manslaughter). There was insubstantial evidence at the close of the evidentiary phase to establish that defendant 'actually, subjectively, kill[ed] under

the heat of passion.' " (*Id*. at p. 554.)  While the Supreme Court recognized there may be circumstances where instructions on both theories of manslaughter are warranted, it rejected any suggestion that a heat of passion instruction is required "in every case in which the only evidence of unreasonable self-defense is the circumstance that a defendant is attacked and consequently fears for his life." (*Id*. at p. 555, italics omitted.)

In this case, Cruz testified in unambiguous terms that the "[o]nly thing that caused [him] to shoot [Villanueva] was fear, that [Villanueva] was about to shoot [him]."  Cruz stated that, when he approached Villanueva's parked vehicle, he did not intend to kill Villanueva, but only "[t]o talk to him."  However, once Cruz opened the driver's door of the vehicle and saw Villanueva reach for a gun, Cruz pulled out his own gun and "shot him as fast as [he] could."  Cruz stated that he shot Villanueva because he was "scared" and in "fear."  At one point in his testimony, Cruz stated that he felt "[p]anic" as he was firing the gun.  However, he attributed his panic and fear at the time of the shooting to his belief that he was "going to die" given the presence of a gun, the look on Villanueva's face, and the prior threats that Villanueva had made against his life.  Cruz maintained that he would not have fired his weapon if he did not see Villanueva with a gun.  Cruz further testified that he knew it was "not right to take someone's life[,] [b]ut what is there to do when you're about to get your life taken?"

Accordingly, as in *Moye*, the thrust of Cruz's testimony was that he acted in self-defense.  Cruz repeatedly testified that the reason he shot Villanueva was because he feared for his own life. In explaining his mental state at the time of the shooting, Cruz did not describe any passion or other extreme emotion beyond the

17

panic and fear that he felt because he believed Villanueva was going to kill him. Because there was no substantial evidence to support a finding that Cruz " 'actually, subjectively, kill[ed] under the heat of passion,' " rather than in reasonable or unreasonable self-defense, the trial court had no duty to instruct the jury on voluntary manslaughter under a heat of passion theory. (*People v. Moye*, *supra*, 47 Cal.4th at p. 554.)

Moreover, even assuming the trial court erred in failing to instruct the jury on the heat of passion theory of voluntary manslaughter, any such error would be harmless under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 because it is not reasonably probable that Cruz would have obtained a more favorable outcome if the jury had been so instructed. (*People v. Gonzalez* (2019) 5 Cal.5th 186, 195–196 [*Watson* standard applies to failure to instruct on lesser included offenses supported by substantial evidence in noncapital cases]; *People v. Moye*, *supra*, 47 Cal.4th at pp. 555–556 [same].)

In finding Cruz guilty of second degree murder, the jury necessarily rejected his account that he shot Villanueva based on an actual or perceived need to defend himself. As the Supreme Court explained in *People v. Moye*, *supra*, 47 Cal.4th at page 557: "Once the jury rejected defendant's claims of reasonable and imperfect self-defense, there was little if any independent evidence remaining to support his further claim that he killed in the heat of passion, and no direct testimonial evidence from defendant himself to support an inference that he subjectively harbored such strong passion, or acted rashly or impulsively while under its influence for reasons unrelated to his perceived need for self-defense. . . . [¶] Moreover, the jury having rejected the factual basis for the claims of reasonable and

18

unreasonable self-defense, it is not reasonably probable the jury would have found the requisite objective component of a heat of passion defense (legally sufficient provocation) even had it been instructed on that theory of voluntary manslaughter." (Italics omitted.)

As in *Moye*, once the jury in this case rejected Cruz's claims of reasonable and unreasonable self-defense, there was no reasonable probability that it would have found Cruz guilty of voluntary manslaughter based on heat of passion even if it had been instructed on that theory. Cruz therefore has failed to show prejudicial instructional error.

## II. Imposition of Section 12022.53, Subdivision (d) Firearm Enhancement

Cruz argues the matter must be remanded for resentencing because the trial court abused its discretion in imposing a 25-year-to-life firearm enhancement on the murder count under section 12022.53, subdivision (d) rather than a lesser-included enhancement under subdivision (b) or (c) of the statute. We find no abuse of discretion in the trial court's sentencing decision.

### A. *Governing Legal Principles*

Section 12022.53 sets forth three escalating sentence enhancements for the personal use of a firearm in the commission of certain enumerated felonies, including murder: a 10-year prison term if the defendant "personally uses a firearm," even if the weapon is not operable or loaded (*id.*, subd. (b)); a 20-year term if the defendant "personally and intentionally discharges a firearm" (*id.*, subd. (c)); and a 25-year-to-life term if the intentional discharge of the firearm causes "great bodily injury" or "death, to any person other than an accomplice" (*id.*, subd. (d)).

19

In cases where multiple section 12022.53 enhancements are found true on the same count, once the trial court imposes punishment for the firearm enhancement with the longest term of imprisonment, the remaining firearm enhancements on that count must be imposed and then stayed.  (*Id.*, subd. (f); *People v. Gonzalez* (2008) 43 Cal.4th 1118, 1123.)

Effective January 1, 2018, the Legislature amended section 12022.53, subdivision (h), to give trial courts discretion to strike or dismiss firearm enhancements "in the interest of justice pursuant to Section 1385."  (§ 12022.53, subd. (h), as amended by Stats. 2017, ch. 682, § 2.)  In deciding whether to strike or dismiss a firearm enhancement, a trial court is required to consider the factors bearing on its section 1385 discretion, including "the rights of the defendant, the interests of society represented by the People, and individualized considerations pertaining to the defendant and his or her offenses and background."  (*People v. Rocha* (2019) 32 Cal.App.5th 352, 359.)

A " 'court's discretionary decision to dismiss or to strike a sentencing allegation under section 1385 is' reviewable for abuse of discretion."  (*People v. Carmony* (2004) 33 Cal.4th 367, 373; accord, *People v. Pearson* (2019) 38 Cal.App.5th 112, 116.)  "In reviewing for abuse of discretion, we are guided by two fundamental precepts.  First, ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." '  [Citations.]  Second, a ' "decision will not be reversed merely because reasonable people might disagree.

20

'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, at pp. 376–377.)

### B. *The Trial Court Did Not Abuse Its Discretion in Declining to Dismiss or Strike the Section 12022.53, Subdivision (d) Enhancement*

In connection with the murder count, the jury found true the firearm enhancement allegations under section 12022.53, subdivisions (b), (c), and (d). In sentencing Cruz on this count, the trial court imposed the 25-year-to life firearm enhancement under section 12022.53, subdivision (d) and stayed the remaining firearm enhancements pursuant to section 12022.53, subdivision (f). On appeal, Cruz asserts the trial court abused its discretion in declining to strike or dismiss the section 12022.53, subdivision (d) enhancement in favor of one of the lesser-included firearm enhancements found true by the jury.

As Cruz points out, appellate courts are currently split on whether the trial court has discretion to impose a 10-year or 20-year firearm enhancement under section 12022.53, subdivision (b) or (c) where only a 25-year-to-life firearm enhancement under section 12022.53, subdivision (d) was alleged and found to be true. (Compare *People v. Morrison* (2019) 34 Cal.App.5th 217 [courts may impose uncharged lesser enhancements] with *People v. Tirado* (2019) 38 Cal.App.5th 637, review granted Nov. 13, 2019, S257658 [courts may not]; *People v. Garcia* (2020) 46 Cal.App.5th 786, review granted June 10, 2020, S261772 [same].) In this case, however, the People alleged all three section

21

12022.53 enhancements on the murder count, and the jury found each of those enhancements to be true. Moreover, the record reflects that the trial court understood it had the discretion to strike or dismiss any of the section 12022.53 enhancements in the interest of justice, and that it expressly declined to do so.

At the January 15, 2020 sentencing hearing, defense counsel specifically asked the trial court to strike each of the three firearm enhancements based on the recent amendment to section 12022.53, or alternatively, to impose only the 10-year firearm enhancement under section 12022.53, subdivision (b). After hearing the argument of counsel, the trial court stated: "All right. Obviously I presided over the trial. I heard the case. I heard the evidence. I was able to observe the witnesses who testified including Mr. Cruz. And the court is aware, the record should be clear the court is aware, of its discretion. I do have that discretion now to strike any firearm enhancement. However, the court is going to deny the request and deny the motion to strike the firearm enhancements for the following reasons." Contrary to Cruz's claim on appeal, there is nothing in the record to suggest that the trial court was unaware of its discretion to strike any or all firearm enhancements under section 12022.53, subdivision (h).

Cruz also asserts the trial court abused its discretion in imposing the section 12022.53, subdivision (d) enhancement given the circumstances of the offense, his lack of a criminal record, and his status as an upstanding citizen and father of young children. However, the record shows the trial court considered relevant aggravating and mitigating factors in declining to strike any of the firearm enhancements on the murder count. (See Cal. Rules of Court, rules 4.421, 4.423,

4.428(b).)  In particular, the trial court noted that, while Cruz's lack of a criminal record was a mitigating circumstance that the court considered, there were several aggravating circumstances, including that the victim was particularly vulnerable, multiple shots were fired, and Cruz fled the scene of the shooting.  Cruz takes issue with the trial court's statements that the victim "didn't do anything to instigate" the offense and that the manner in which Cruz carried out the murder "would indicate some planning, sophistication, and professionalism."  However, in determining whether the trial court abused its discretion in refusing to strike or dismiss an enhancement, the relevant inquiry is whether its sentencing decision was "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377.)  Here, the totality of the record at sentencing demonstrates that the trial court weighed the relevant factors and made an informed sentencing decision that was neither irrational nor arbitrary. There was no abuse of discretion.

III. **Presentence Custody Credits**

Lastly, Cruz asserts, and the People agree, that the sentencing minute order and the abstract of judgment do not accurately reflect his presentence custody credits.  At the sentencing hearing, the trial court awarded Cruz 777 days of actual custody credit.  However, the minute order for the sentencing hearing fails to identify any custody credit, and the abstract of judgment incorrectly lists Cruz's actual custody credit as "000."  Accordingly, the sentencing minute order and abstract of judgment must be modified to reflect that Cruz was awarded 777 days of actual custody credit at sentencing.  (See *People v. Mitchell* (2001) 26 Cal.4th 181, 185–186 [when there is a

23

discrepancy between the court's oral pronouncement and the minute order or abstract of judgment, the oral pronouncement controls].)

## DISPOSITION

The judgment is modified to reflect an award of 777 days of actual custody credit.  As modified, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED.


ADAMS, J.*


We concur:


LAVIN, Acting P. J.


EGERTON, J.


---

**\*** Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.