Filed 9/14/22  P. v. Sullivan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW SCOTT SULLIVAN,<br><br>Defendant and Appellant. | D078877<br><br><br>(Super. Ct. No. SCD 275353) |

APPEAL from a judgment of the Superior Court of San Diego County, Albert T. Harutunian III, Judge.  Affirmed as modified.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Michael D. Butera, Deputy Attorneys General, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Defendant Matthew Scott Sullivan appeals from a judgment of conviction for second degree murder. A jury convicted Sullivan of the murder of his wife Elizabeth after she went missing in 2014 and her body was found in 2016. On appeal, Sullivan raises two contentions. First, Sullivan argues that the judgment should be reversed because the trial court erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter based on heat of passion. Second, Sullivan contends that pursuant to Assembly Bill No. 1869 (2019–2020 Reg. Sess.) (Assem. Bill 1869), which added, amended or repealed various statutes related to fees imposed by the courts on convicted defendants, this court should vacate any balance of a $154 criminal justice administration fee that remained unpaid as of July 1, 2021. The People concede that Sullivan is correct with respect to this issue.

We disagree with Sullivan's contention that the trial court erred in failing to instruct the jury on voluntary manslaughter. However, we agree with Sullivan and the People with respect to the effect of Assem. Bill 1869; Sullivan is entitled to have vacated any balance of the criminal justice administration fee that remained unpaid as of July 1, 2021. We therefore vacate the unpaid balance of the criminal justice administration fee, and otherwise affirm the judgment as modified.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

    1. *The prosecution's case*

        a. *General background*

Sullivan and Elizabeth married in 2010 and had two daughters, born in 2010 and 2012. The family lived in military housing in the Liberty Station area of San Diego[1]; Sullivan was in the United States Navy.

The couple's relationship began to deteriorate after the birth of their second child. There were instances of domestic violence that other people came to learn about. For example, in April 2014, Sullivan threw a cooking pan through a window while the couple were arguing. During another argument around the same time, Sullivan pushed Elizabeth to the floor, injuring her. At some point, Child Protective Services opened an investigation into the domestic violence in the home. Sullivan was directed to refrain from engaging in further violence. Sullivan claimed to be participating in anger management classes, but during a FaceTime call in August 2014, a friend of Elizabeth's witnessed Sullivan throw a burrito at her, hitting her in the back of the head.

As of June 2014, Elizabeth had indicated to friends that she was thinking about ending the marriage. Elizabeth and Sullivan discussed divorcing in August and September 2014.

Meanwhile, in July 2014, Elizabeth created an account on Tinder, an online dating website. On August 3, 2014, Elizabeth went on a date with Steve S., and for the next few weeks, she had a casual romantic relationship

---

[1] The townhome had three levels, including bedrooms on the second and third floors, as well as a garage.

with him.  Within a month, Sullivan discovered Elizabeth's affair and confronted her.  Steve had been unaware that Elizabeth was married until September 13 or 14, 2014, when he became aware of Elizabeth's marriage.  Steve broke off the relationship with Elizabeth.  He last saw her on September 23, 2014, when they met in a parking lot so that Steve could return some of Elizabeth's belongings.

Sullivan had begun monitoring Elizabeth's texts and emails during this time.  He contacted Steve five times.  Sullivan indicated to Steve that he was aware of Elizabeth's communications with Steve, and expressed an intention to cut off Elizabeth financially.

During this period, Elizabeth drove a black Toyota Prius.  Sullivan did not have a driver's license or a car and drove only occasionally.

Police records demonstrated that on October 13, 2014, Sullivan placed two separate telephone calls to the police nonemergency line.  At 12:59 p.m., Sullivan called to express concern that Elizabeth was trying to get him in trouble and to express "concern[] for [his] safety"; according to Sullivan, he was worried that Elizabeth was going to try to "use abuse fraud to try to have [him] . . . evicted or arrested."  When Sullivan was asked whether he thought that Elizabeth was "trying to, like, frame [him]," Sullivan responded, "Yes."  Sullivan mentioned that Elizabeth had inflicted a gash on her arm, at or near the time when he learned of Elizabeth's affair, and indicated that he had found out about the gash only after Elizabeth had caused it.  Sullivan claimed that Elizabeth had "contacted the police several times saying, I don't know, I'm abusing her or something now to get revenge on me . . . ."[2]

---

2    Police records demonstrated that, other than Sullivan's October 13, 2014 telephone calls to police, there were only two other telephone calls placed to 911 regarding the Sullivan family residence. Elizabeth placed one of

4

Sullivan complained that Elizabeth would leave the house "for days." He also stated that he had discovered Elizabeth's affair "a few months ago."

Sullivan made the second call at 2:25 p.m. During that call, Sullivan indicated that he had been "told to call back in case to report if she has any contact with me[,] if she came back or anything." He said that he was reporting that he had been in communication with Elizabeth, and that she was "on her way soon." He indicated that Elizabeth had taken "all" the money out of the couples' joint bank account.

Elizabeth spoke with her friend C.H. at approximately 7:00 p.m. on October 13, 2014.[3] Elizabeth was whispering and said that she and Sullivan "had had some kind of disagreement." She indicated that "she was afraid." C.H. suggested that Elizabeth get a glass of wine and "lock herself in her room or her girls' room." Elizabeth told C.H. that she would follow this plan, and told C.H., "I have my vino, and I'm going to lock myself in my room." C.H. told Elizabeth that if she felt "that seriously about it, if it doesn't get any better, call the police in San Diego." Elizabeth then told her friend that she had to go. C.H. did not hear back from Elizabeth that night, or at any time thereafter, despite C.H.'s attempts to contact Elizabeth in the following days.

b. *Elizabeth is reported missing by a friend*

On October 14, 2014, Nathan C., a good friend of Elizabeth's, reported her missing. Nathan had not heard from Elizabeth for two days. Elizabeth

---

the two calls on March 30, 2014; the other was placed on March 19, 2014 by a neighbor who had heard some "loud banging."

3    C.H. testified that the communication occurred at "[a]bout 10:00 [p.m.] eastern time."

had not responded to his text messages, and this was unusual given the nature of their friendship.

According to Nathan, he last saw Elizabeth in person on the weekend of October 10, 2014, when she visited him at his home. Before Elizabeth arrived at Nathan's home, she had called him, upset about the fact that Sullivan had informed her that his family would be moving into their house. Elizabeth did not get along with Sullivan's family and was afraid of the effects that this move would have on the couple's children. When Elizabeth met up with Nathan, she indicated that she had an appointment with a divorce attorney scheduled for October 13, 2014.

Nathan testified that on October 12, 2014, Elizabeth called him and said that she was frightened and worried. Elizabeth had gone to a store to purchase something for her children and became aware that there was no money in the couple's bank account. According to Nathan, when Elizabeth returned home, Sullivan informed her that he had taken all of the money out of their bank account. She told Nathan that she had convinced Sullivan to put the money back into the account. The October 12, 2014 telephone call was the last time that Nathan heard from Elizabeth.

After Nathan tried to reach Elizabeth on October 13 and 14, 2014 and received no response, he called Sullivan. Sullivan told Nathan that he did not know where Elizabeth was, and indicated that his family was there with him and that he "had to tend to them." Sullivan suggested that Nathan call Elizabeth's "boyfriend," Steve. Nathan contacted Steve, but Steve had no information about Elizabeth's whereabouts.

Nathan had also asked Sullivan for Elizabeth's father's telephone number, but Sullivan would not provide it. Nathan eventually tracked down

6

Elizabeth's father's telephone number, called him, and told him that Elizabeth was missing.

c. *The initial investigation and search of the Sullivan home*

On October 17, 2014, police investigators contacted Sullivan at the Sullivan family home. Sullivan's mother, her girlfriend, and Sullivan's sister were also present at the home.

Sullivan told the investigators that he had last heard from Elizabeth the evening of October 13, 2014.. Sullivan claimed that because of the couple's marital problems, he did not think anything was wrong when Elizabeth left the house and did not return. Sullivan complained to the investigators about the fact that Elizabeth had spent $1,800 on a divorce attorney, despite the fact that free services were available through the Navy. Although Sullivan complained about Elizabeth contacting a divorce attorney, Sullivan indicated his own desire to end his marriage to Elizabeth.

The investigators performed a cursory search of the residence after receiving Sullivan's permission to do so. The third-floor bedroom where Elizabeth had been sleeping was a mess.[4] Sullivan told the investigators that the room was in the condition in which Elizabeth had left it. Inside the garage, detectives noticed a 4-by-4 box freezer. The freezer was plugged in, but it was empty. There was no obvious odor coming from the freezer. Elizabeth's Prius was in the garage. Investigators found a parking lot receipt from October 13, 2014, inside the vehicle. Subsequent investigation revealed that the parking lot identified on the receipt was near the office of the attorney with whom Elizabeth had met on October 13.

---

[4]     At some point in late 2013, Sullivan and Elizabeth began sleeping in separate bedrooms.

Investigators learned that Sullivan had called the law firm after Elizabeth's appointment to inquire whether the office had run his credit card. Bank records confirmed that Elizabeth had telephonically authorized payment of a retainer on October 10, 2014.

On November 20, 2014, Sullivan voluntarily went to the police station and spoke with investigators. Sullivan provided information about how he and Elizabeth had met and when they married, and he discussed the fact that the couple began having problems after their second child was born.

Sullivan agreed to allow police to take DNA samples from his daughters as a genetic reference for Elizabeth. On December 11, 2014, detectives returned to the Sullivan residence and obtained DNA swabs from Sullivan's daughters.

Police were able to obtain electronic transaction records that showed that on October 14, 2014, Sullivan's debit card and Elizabeth's Ace Hardware preferred customer card had been used to purchase carpet cleaner from an Ace Hardware store located near the Sullivan residence. In addition, on November 28, 2014, the same Ace Hardware preferred customer card that had been used in the October 14 transaction was used to purchase carpet cleaner, kitchen trash bags, a bath mat, bathroom cleaner, hand soap, and a large roll of clear plastic wrap.

Investigators checked flight manifests leaving the San Diego airport from October 13, 2014, forward. Elizabeth's name did not appear on any manifests. There was no sign that Elizabeth had crossed the border or that she was staying at a local hotel. Investigators did not find any evidence that Elizabeth had used any aliases. A review of a pawnshop transaction database revealed that no pawns had been transacted in Elizabeth's name. Bank records showed that Elizabeth had transferred $1,072 from the couple's

8

joint account to her personal account on October 13, 2014. However, the bank records showed that Elizabeth had engaged in no further activity with respect to the joint account after that date, and the $1,072 that she had transferred to her personal account remained in the account.

In addition, Elizabeth's cellular telephone records demonstrated that her phone had not been taken out of the Sullivan family home before being turned off. There was no activity on Elizabeth's cellular telephone after 7:21 p.m. on October 13, 2014. Elizabeth's "What'sApp" account linked to her cellular telephone showed that it had last been used on October 13, 2014, as well.

Sullivan's cellular telephone records showed that there were multiple text messages and calls originating from Sullivan's telephone and placed to Elizabeth's cellular telephone between October 9 and November 3, 2014. Between October 9 and October 13, specifically, there were a significant number of communications between Sullivan's cellular telephone and Elizabeth's.[5] The last text message from Elizabeth's telephone to Sullivan's telephone occurred shortly after 5:18 p.m. on October 13, 2014.[6]

On October 14, 2014, beginning at 2:32 a.m. and continuing until 10:31 p.m., there were 15 voice or text communications from Sullivan's telephone to Elizabeth's telephone. Between October 14 and 20, Sullivan's telephone sent text messages or voice messages to Elizabeth's telephone every day. After that, Sullivan's telephone made sporadic contact with Elizabeth's telephone

---

[5] For example, on October 10, 2014, there were 118 transactions between the two telephones. On October 12, 2014, there were 132 transactions.

[6] The last text message to originate from Elizabeth's phone and placed to Steve's phone was at 7:21 p.m. on October 13, 2014.

9

until March 22, 2015, when all communication between the two phones ceased.

   d. *Sullivan appears to move on with his life without Elizabeth and a homicide team is assigned to the case*

Less than a month after Elizabeth disappeared, Sullivan created a Facebook post in which he indicated that he was in a relationship with another woman. During this period, Sullivan also "unfriended" Elizabeth on Facebook and removed all but one photo of her from his profile. Sullivan stopped communicating with Elizabeth's friends who were trying to help find her. He never sought updates from detectives regarding the status of the investigation into Elizabeth's disappearance.

Later Facebook posts by Sullivan revealed that in 2015, he and his new girlfriend were engaged and expecting a child together.

A homicide team was assigned to investigate Elizabeth's disappearance as of December 24, 2014.

In April 2015, detectives obtained consent from Sullivan to search Elizabeth's closet to try to generate a lead. Detectives could not locate Elizabeth's belongings and confronted Sullivan. Sullivan said that he had discarded all of her belongings and admitted that he had attempted to mislead detectives about having done so. The investigation remained open for many months without further leads.

   e. *Elizabeth's body is found*

On October 4, 2016, a badly decomposed body was found on the shoreline near the 2600 block of Farragut Road in the Liberty Station area of San Diego, which is approximately one-half mile from the Sullivan family residence. The body was identified as Elizabeth's two weeks after it was discovered.

Elizabeth's body was found lying on its right side, in a fetal-like position.  Her body did not appear to have been in the water for very long.  The clothing that was found on Elizabeth's body matched Sullivan's description of what she was wearing when he last saw her.

There were two different levels of decomposition found on Elizabeth's body.  The left side was dark brown; the skin was hardened and dehydrated.  This type of decomposition is consistent with that part of her body having been exposed to warm, dry air for a prolonged period of time.  The right side of Elizabeth's body appeared much paler.  It was covered with adipocere, which is a soapy or waxy substance that forms on a body when the body is in a very humid or wet environment for a prolonged period of time.  The lower right side of Elizabeth's body had a patch of skin that had been mummified and then covered by adipocere.  This suggested that Elizabeth's body had been moved from one environment to another.  In addition, there was minimal insect activity on Elizabeth's body, which indicated that the body had been wrapped, buried, or placed in a container, or that there had been some barrier around it that had prevented insects from reaching it.

The cause of death was determined to be multiple sharp force injuries.  Elizabeth had suffered three stab wounds to the lower left ribs and a stab wound to the right back near the lower ribs.  The rib wounds could have been enough to cause Elizabeth's death.  In addition to the rib wounds, Elizabeth's clothing had multiple holes in the front and back—holes that were consistent with trauma inflicted by a knife.  Elizabeth's nasal bone was broken, her jaw was fractured, and there was a cut on her cheek near her nose.

The pathologist who examined Elizabeth's body, in consultation with an anthropologist, estimated that Elizabeth had been dead for approximately one to two months prior to the discovery of her body.  However, the

pathologist indicated that this estimate was not very accurate, explaining that the determination that the body appeared to have been dead for approximately one to two months was based purely on the condition of the body at the time it was found, and could not account for the possibility that the body had been kept under different temperatures or conditions that would have slowed or stopped decomposition.[7]

The pathologist indicated that toxicology tests performed on Elizabeth's body were positive for fentanyl, cannabinoids, and methamphetamine.

### f. *Events subsequent to the discovery of Elizabeth's body*

Either on the night of October 7 or in the early morning hours of October 8, 2016, just a few days after Elizabeth's body was discovered, Sullivan vacated his residence and left the keys to the home with the military housing rental office. Sullivan had been discharged from the Navy and moved to Maryland with his girlfriend, their baby and his and Elizabeth's two daughters. Sullivan did not inform investigators that he was leaving the San Diego area, and when asked by an investigator to provide his new address, he said he did not know it. Although Sullivan told the investigator that he would provide his new address the following day, Sullivan never called the investigator.

On October 12, 2016, investigators and criminalists searched the former Sullivan family residence again. The bedroom that Elizabeth had been using as her own was tested with Luminol. The testing revealed blood residue on the walls, on the floor under the carpet, in the closet area, and in the bathroom. DNA testing performed on the blood residue confirmed that the blood was Elizabeth's. The box freezer that had been in the garage

---

[7] The pathologist explained that it is possible to delay or interrupt decomposition through refrigeration or freezing.

during a prior search of the home was no longer there, but a specially trained cadaver dog was brought in to investigate a strong odor that lingered in the garage.[8]  The cadaver dog provided a signal indicating that it detected the scent of human remains; swabs collected from the area where the dog indicated that human remains had been located tested positive for both Sullivan's and Elizabeth's DNA.

The police investigation team returned to the former Sullivan family residence on November 9, 2017.  A detective went into the attic of the home and began looking under insulation in the attic.  He discovered a folding knife, which he described as something that one "might carry . . . in either a law enforcement or military capacity," hidden beneath the attic insulation. The blade was tested for blood and DNA, and the results showed that Elizabeth's blood was on the blade.  The blade also had Sullivan's DNA on it.

2.    *The defense*

The defense called a San Diego County Deputy Sheriff and his wife, both of whom testified about a weekend in October 2014 when they attended a soccer game in the Liberty Station area.  After seeing photos of Elizabeth on the local news, they recognized her as the same woman who had approached them and other parents who were at the game and insisted that her cellular telephone was in the vicinity where these individuals were located.  Elizabeth indicated that she had slept on the field; the couple was not sure what Elizabeth meant, but they recalled seeing cots set up across the field.

The defense also elicited testimony that Elizabeth was a "cutter"—i.e., a person who inflicts cuts on his or her own body as a method of alleviating

---

[8]    The detective did not note the existence of a cadaver odor in her report regarding the October 12, 2016 search of the garage.

emotional distress. Typically, the cuts inflicted are superficial. In September or early October 2014, Elizabeth had apparently cut herself more deeply than she had intended, and she had placed bandages on her forearms as a result of these cuts.

3. *Rebuttal evidence*

The People called a witness who was employed by the San Diego Rescue Mission. This witness explained that one of the Rescue Mission's main fundraising events was something called "Sleepless San Diego." This event takes place annually at MTC Park in Liberty Station. During this event, participants can spend the night on donated cots to empathize with individuals who experience homelessness. In 2014, the event was held on October 11 and 12.

B. *Procedural background*

The San Diego County District Attorney filed an information charging Sullivan with first degree murder (Pen. Code, § 187, subd. (a)). The information also alleged that Sullivan personally used a deadly and dangerous weapon in the commission of the offense (§ 12022, subd. (b)(1)).

A jury found Sullivan guilty of second degree murder, a lesser-included offense of the charge in count 1, and also returned a true finding as to the deadly weapon enhancement allegation.

The trial court sentenced Sullivan to an indeterminate term of 15 years to life on count 1, plus a consecutive one-year term on the deadly weapon enhancement. The court imposed statutorily authorized, fines, fees, and assessments, including a criminal justice administration fee of $154 under Government Code section 29550.1.

Sullivan filed a timely notice of appeal.

14

III.

DISCUSSION

A. *Sullivan was not entitled to an instruction on heat of passion voluntary manslaughter as a lesser included offense to the murder charge*

Sullivan contends that the trial court prejudicially erred in failing to instruct the jury on the lesser included offense of voluntary manslaughter based on heat of passion. (See § 192, subd. (a); see also, CALCRIM No. 570.) Sullivan further claims that the trial court's error in failing to provide a voluntary manslaughter instruction denied him due process.

1. *Additional background*

During a jury instruction conference, defense counsel requested that the jury be given an instruction on voluntary manslaughter based on heat of passion. Defense counsel argued that the instruction was required based on the authority of *People v. Berry* (1976) 18 Cal.3d 509 (*Berry*), *People v. Elmore* (1914) 167 Cal. 205, and *People v. Borchers* (1958) 50 Cal.2d 321. According to defense counsel, evidence regarding Elizabeth's infidelity, Sullivan's calls to police on October 13, 2014, and the ongoing dispute between the couple was evidence that amounted to provocation within the meaning of case law on heat of passion and thus warranted the giving of an instruction on voluntary manslaughter.

The prosecutor disagreed, arguing that there was no evidence of provocation that would be sufficient to cause an ordinary person of average disposition to act rashly and without deliberation in stabbing the victim. The People noted that the evidence demonstrated that Sullivan had learned of his wife's infidelity *weeks* before he killed her and further noted that the recordings of Sullivan's calls to the police nonemergency line demonstrated that he was calm in his interactions with the dispatchers. The prosecutor

15

stated that while there was testimony that Elizabeth and Sullivan had argued on the evening of October 13, 2014, there was no evidence that the intensity of this argument was different from their other arguments, or that it had been "violent, that it was so upsetting, that there was any taunting, . . . that there was anything that might lead [Sullivan] to be so enraged that he killed her without really thinking about it." The prosecutor argued that a voluntary manslaughter defense was inconsistent with Sullivan's repeated story that Elizabeth had told him that she was leaving that night, and that she left and did not return. Finally, the prosecutor noted that the only evidence presented at trial regarding the argument between Sullivan and Elizabeth on October 13, 2014 was that Elizabeth was alive at the time the argument ended; Elizabeth had indicated to her friend C.H. during their telephone call that evening that she was going to lock herself in her room. There was no evidence about any additional argument or provocation after that point in the evening.

After this exchange, defense counsel withdrew the request for the heat of passion voluntary manslaughter instruction.

The trial court noted that, regardless of defense counsel's withdrawal of the request for the instruction, the court would have a sua sponte duty to give the instruction if there was evidence to support a conviction for voluntary manslaughter but not for murder, because voluntary manslaughter is a lesser included offense of the charged offense. The trial court asked defense counsel whether he was affirmatively requesting that no voluntary manslaughter instruction be given on the ground that it was inconsistent with the defense. Defense counsel replied that the defense was taking no position.

In ruling on the issue, the trial court stated, "[B]ottom line is I do not believe it's justified under the facts of this case, the evidence that's been

16

presented in this case." The court explained, "[T]he Court's obligation to give this depends on the Court identifying substantial evidence that would support the theory, and that is lacking. I listened to everything that the defense previously was pointing to as allegedly being evidence of provocative action, and I don't believe anything that was identified was actually evidence of provocation." Later, the court stated, "We don't have some evidence other than just, you know, theorizing that, well, then the parties could have had some sort of subsequent confrontation that resulted in the defendant acting in—with heat of passion, and I think that's just absent from the record that we do have." The court added, "[N]one of the acts that have been identified would lead any reasonable person or average person to react in the manner that would be rising to the level of deadly force out of the heat of passion." The court ruled that it would not give an instruction on heat of passion voluntary manslaughter.

2. *Relevant legal standards*

On appeal, a reviewing court independently determines whether the trial court erred in failing to instruct on a lesser included offense. (*People v. Manriquez* (2005) 37 Cal.4th 547, 584.)

" 'In criminal cases, even absent a request, the trial court must instruct on general principles of law relevant to the issues raised by the evidence. [Citation.] This obligation includes giving instructions on lesser included offenses when the evidence raises a question whether all the elements of the charged offense were present, but not when there is no evidence the offense was less than that charged. [Citation.] The trial court must so instruct even when, as a matter of trial tactics, a defendant not only fails to request the instruction, but expressly objects to its being given. [Citations.]' [Citation.]" (*People v. Moye* (2009) 47 Cal.4th 537, 548–549 (*Moye*).)

17

" ' "Murder is the unlawful killing of a human being with malice aforethought. (§ 187, subd. (a).) A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of . . . voluntary manslaughter. (§ 192.)" [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] "But a defendant who intentionally and unlawfully kills lacks malice . . . in limited, explicitly defined circumstances: either when the defendant acts in a 'sudden quarrel or heat of passion' [citation], or when the defendant kills in 'unreasonable self-defense'—the unreasonable but good faith belief in having to act in self-defense [citations]." [Citation.] Because heat of passion and unreasonable self-defense reduce an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide [citation], voluntary manslaughter of these two forms is considered a lesser necessarily included offense of intentional murder [citation].' [Citation.]" (*Moye, supra*, 47 Cal.4th at p. 549.)

Heat of passion is not an element of voluntary manslaughter, but, rather is a " 'theor[y] of partial exculpation' that reduce[s] murder to manslaughter by negating the element of malice." (*Moye, supra*, 47 Cal.4th at p. 549.) "A heat of passion theory of manslaughter has both an objective and a subjective component. [Citations.]" (*Ibid*.) " ' "To satisfy the objective or 'reasonable person' element of this form of voluntary manslaughter, the accused's heat of passion must be due to 'sufficient provocation.' " [Citation.]' [Citation.] '[T]he factor which distinguishes the "heat of passion" form of voluntary manslaughter from murder is provocation. The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim. [Citations.] The

18

provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection. [Citations.]' [Citation.]" (*Moye, supra*, 47 Cal.4th at pp. 549–550.)

"To satisfy the subjective element of this form of voluntary manslaughter, the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation. [Citation.] 'Heat of passion arises when "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." [Citations.]' [Citation.] ' " 'However, if sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter . . . ." [Citation.]' [Citation.]" (*Moye, supra*, 47 Cal.4th at p. 550.)

3. *Analysis*

Sullivan argues that the evidence in this case "shows provocation by the victim over a period of time," and that this evidence, combined with evidence that the manner of the killing was "consistent with a killing in the heat of passion," was substantial evidence that would support a finding that the killing constituted only heat of passion voluntary manslaughter and not murder. We disagree.

First, there is no evidence of provocative conduct on Elizabeth's part at or near the time of the killing, much less evidence of conduct that was " 'sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection' " (*Moye, supra*, 47 Cal.4th at p. 550). Sullivan contends that Elizabeth's infidelity

19

constituted "ongoing" provocation that warranted a heat of passion instruction. Although in certain circumstances a defendant's discovery of a spouse's infidelity could provide evidence that a victim had sufficiently provoked a defendant to cause him or her to act rashly in the heat of passion, the law is clear that " ' " ' "if sufficient time has elapsed for the passions of an ordinarily reasonable person to cool, the killing is murder, not manslaughter." ' " [Citation.]' " (*People v. McShane* (2019) 36 Cal.App.5th 245, 256 (*McShane*), quoting *People v. Rangel* (2016) 62 Cal.4th 1192, 1225; *People v. Beltran* (2013) 56 Cal.4th 935, 951 [malice is not negated "[i]f sufficient time has elapsed for one's passions to 'cool off' and for judgment to be restored"].)

The evidence demonstrated that Sullivan became aware of Elizabeth's infidelity with Steve in August 2014. Not only was Sullivan aware of Elizabeth's relationship with Steve, but he communicated with Steve on five occasions in the weeks preceding Elizabeth's death, and he discussed the affair with Elizabeth. Significantly, Steve ended his relationship with Elizabeth in mid-September, and Elizabeth last saw Steve on September 23, 2014, which was weeks before the killing. Given the amount of time that elapsed after Sullivan became aware of Elizabeth's affair, as well as the time that had passed since the affair ended, that affair could not, on its own, constitute sufficient provocation for heat of passion to apply. (See, e.g., *McShane, supra*, 36 Cal.App.5th at p. 256 [four days after provocative conduct was sufficient " 'cooling time,' as a matter of law"]; *Moye, supra*, 47 Cal.4th at p. 551 [no heat of passion instruction warranted where defendant had sufficient time to cool off when fight with victim happened the night before the killing]; *People v. Hyde* (1985) 166 Cal.App.3d 463, 473 [finding that sufficient time had elapsed for passion to subside and reason to

20

return where defendant stalked his ex-girlfriend's new boyfriend for three days before killing him].)

Sullivan relies in large part on *Berry, supra,* 18 Cal.3d 509 to support his contention that Elizabeth's affair constituted sufficient provocation to support the giving of a heat of passion voluntary manslaughter instruction. The evidence presented at trial in *Berry*, however, was materially different from the evidence presented at trial in this case. In *Berry*, there was evidence that the victim, the defendant's wife, had engaged in a two-week pattern of "tormenting" the defendant by "alternately taunt[ing] defendant with her involvement with [another man] and at the same time sexually excit[ing] defendant." (*Id.* at p. 513.) According to the defendant's testimony, this conduct amounted to a "two-week period of provocatory conduct by his wife . . . that could arouse a passion of jealousy, pain and sexual rage in an ordinary man of average disposition such as to cause him to act rashly from this passion." (*Id.*, at p. 515.) In addition, a psychiatrist called as a defense expert opined that the defendant's spouse was "suicidally inclined," leading her to purposefully instigate "a dangerous situation with defendant," that included "continually provok[ing] defendant with sexual taunts and incitements, alternating acceptance and rejection of him," and accompanying this with "repeated references to her involvement with another man. (*Id.* at p. 514.) There was no evidence of such provocative conduct in this case. Rather, the evidence demonstrated that Elizabeth did not flaunt her affair, but instead, attempted to keep it hidden. Further, as previously noted, the affair ended in mid-September, many weeks before the murder.

In addition, in *Berry*, the defendant's contention that he had acted in the heat of passion was central to his defense, and he testified in support of this defense. (*Berry, supra*, 18 Cal.3d at pp. 515–516 ["It is significant that

21

both defendant and [the defense expert] testified that the former was in the heat of passion under an uncontrollable rage when he killed [the victim.]"].) Thus, the defendant in *Berry* ensured, through his own testimony and that of a defense expert, that there was evidence in the record that supported giving a heat of passion instruction. (See *id*. at p. 513 ["At trial defendant did not deny strangling his wife, but claimed through his own testimony and the testimony of a psychiatrist . . . that he was provoked into killing her because of a sudden and uncontrollable rage so as to reduce the offense to one of voluntary manslaughter"].) In contrast, Sullivan offered no evidence at trial that supported a conclusion that he killed Elizabeth while overcome by sudden, uncontrollable emotion. Sullivan did not testify, and there were no witnesses to the killing or to what may have occurred between Sullivan and Elizabeth close to the time of the killing. The only evidence of an argument on the evening that Elizabeth disappeared demonstrated that the parties were no longer actively engaged in it and that Elizabeth had retreated to her bedroom to be alone. Further, Sullivan's defense consisted of a denial of any involvement in Elizabeth's murder, including a suggestion that Elizabeth had been seen alive after October 13, 2014, as well as a suggestion that Elizabeth's blood had been found in her room because she had cut herself as a result of her cutting habit. Thus, there is no evidence that Sullivan was acting under " 'the actual influence of a strong passion' induced by such provocation" (*Moye, supra*, 47 Cal.4th at p. 550) when he killed Elizabeth.

We also reject Sullivan's attempt to rely on the manner of the killing in support of his contention that a heat of passion voluntary manslaughter instruction was required. Sullivan argues that the fact that Elizabeth was stabbed multiple times, and that she suffered a fractured nose and jaw, demonstrates that the killing was "consistent with an emotional reaction."

22

He also argues that the location of the stab wounds suggests that the killing was done in an emotional state: "Had appellant, who the Navy likely trained to kill efficiently, killed [Elizabeth] dispassionately, there would not have been multiple wounds of varying depths over different areas of the body," and "[i]nstead, a trained killer likely would go for the jugular, the femoral artery, or directly to the heart." All of this is speculation and conjecture. Notably, Sullivan fails to cite to the record in support of these arguments. Further, even if one were to presume that the nature of the wounds that Elizabeth suffered could provide a basis to infer something about Sullivan's mental state or motivation, the wounds could also support a conclusion that Sullivan acted out of revenge or desire to inflict extreme pain, and not heat of passion. (See *People v. Williams* (1995) 40 Cal.App.4th 446, 453 [" 'Heat of passion may not be based upon revenge' "]; see also *People v. Cole* (2004) 33 Cal.4th 1158, 1214 [severity of victim's wounds may be consisted with heat of passion, but also could be consistent with " 'intent to inflict cruel suffering' "].)

In sum, Sullivan cannot avoid the fact that the record lacks any evidence of any provocative conduct by Elizabeth that could be considered "sufficiently provocative" to have caused "an ordinary person of average disposition to act rashly or without due deliberation and reflection," or evidence that Sullivan was acting under the heat of passion when he killed Elizabeth. The trial court therefore did not err in declining to instruct the jury on heat of passion voluntary manslaughter, and Sullivan's due process right to a fair trial was not violated by the trial court's decision in this respect.

B.  *Sullivan is entitled to the vacatur of any portion of the criminal justice administration fee that remained unpaid as of July 1, 2021*

Sullivan contends that the repeal of former Government Code section 29550.1, the statute pursuant to which the trial court imposed a criminal justice administration fee of $154, and additional changes to the Government Code that were enacted pursuant to Assembly Bill No. 1869, require that any portion of his criminal justice administration fee that remained unpaid as of July 1, 2021 be vacated.  The People concede the issue.

The Legislature enacted Assem. Bill 1869, effective July 1, 2021, which, among other things, repealed section 29550.1 of the Government Code and added section 6111 to the Government Code. (Assem. Bill No. 1869 (2019– 2020 Reg. Sess.) § 11.)  The newly added Government Code section 6111 states:  "On and after July 1, 2021, the unpaid balance of any court-imposed costs pursuant to [Government Code] [s]ection 27712, subdivision (c) or (f) of [Government Code] [s]ection 29550, and [Government Code] [s]ections 29550.1, 29550.2, and 29550.3, as those sections read on June 30, 2021, is unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated."  (Stats. 2020, ch. 92, § 11.)

The plain language of Government Code section 6111 mandates that any unpaid balance of the costs imposed pursuant to former Government Code section 29550.1 automatically became unenforceable and uncollectible beginning on July 1, 2021, and also requires that any portion of that fee that remains unpaid as of July 1, 2021 be vacated.  (*People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953.)  We therefore vacate any balance of the costs imposed by the court pursuant to former Government Code section 29550.1 that remained unpaid as of July 1, 2021.

IV.

DISPOSITION

Sullivan's conviction for second degree murder is affirmed.

The portion of the criminal justice administration fee imposed by the court pursuant to former Government Code section 29550.1 that remained unpaid as of July 1, 2021 is vacated. The judgment is affirmed as so modified.

On remand, the trial court shall amend the abstract of judgment to reflect the vacatur of any balance of the fee imposed pursuant to former Government Code section 29550.1 that remained unpaid as of July 1, 2021. The court shall forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.

AARON, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.